**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **MICHAEL RICO,** | * | |
| **Plaintiff,** | * | |
| **v.** | | **Case No.: GJH-18-1949** |
| | * | |
| **ROBERT GREEN,** *et al.*, | * | |
| **Defendants.** | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

Plaintiff Michael Rico brought this consolidated civil action against Defendants Eric Watkins, Carlos Taylor, Andre Brown, Patrick Beam, Robin White, Anthony Sturgess, Shelford A. Gilliam, Susan Malagari, Robert Green, Jane Doe Nurses ("Nurse Defendants"), and Montgomery County, alleging various 42 U.S.C. § 1983 claims for violations of Plaintiff's constitutional rights—including violations of Plaintiff's rights under the First, Fourth, Eighth, and Fourteenth Amendments of the United States Constitution—and various tort claims arising under Maryland law—including assault, battery, intentional infliction of emotional distress, and negligent retention and supervision. ECF No. 53. Pending before the Court is Defendants' Motion to Dismiss Plaintiff's Complaint, or in the Alternative, for Summary Judgment, ECF No. 55, and Plaintiff's Motion for Waiver of Notice Requirement Pursuant to the Local Government Tort Claim Act, ECF No. 58.[1]  No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For

---

[1] Also pending before the Court is Defendants' Motion for Bifurcation of Counts XI–XIII and Partial Stay of Discovery. ECF No. 59. Defendants, however, subsequently filed a Line Withdrawing Motion to Bifurcate and Stay Discovery as Premature. ECF No. 61. Thus, the Motion will be deemed withdrawn.

the following reasons, Defendants' Motion to Dismiss is denied, in part, and granted, in part, and Plaintiff's Motion for Waiver of Notice Requirement is granted.

## I.     BACKGROUND[2]

### A.     Factual Background

#### i.     Background on Plaintiff, Plaintiff's History of Migraines, and MCCF's Failure to Provide Prompt Treatment

In 2017, while he was facing drug distribution charges in the Circuit Court for Montgomery County, Maryland, Plaintiff was held under pretrial detention in the custody, care, and protection of the Montgomery County Correctional Facility ("MCCF"). ECF No. 53 ¶¶ 1, 29–30. Plaintiff remained at MCCF for approximately one year before he was incarcerated at the Maryland Correctional Training Center ("MCTC") in Hagerstown, Maryland. *Id.* ¶¶ 30–31. Plaintiff has since been released, under supervision, from MCTC. ECF No. 56-1 ¶ 10.

Plaintiff suffers from severe ocular migraine headaches. ECF No. 53 ¶ 2. This condition is extremely painful, and the symptoms are debilitating, causing Plaintiff severe head and eye pain, dizziness, vomiting, and vision difficulties. *Id.* ¶ 32. A migraine episode can sometimes confine Plaintiff to bed for days. *Id.* Plaintiff normally suffers one to two migraines each month, but upon entering MCCF in May 2017, the stress of incarceration and the lack of control over his diet increased the frequency and severity of Plaintiff's migraine episodes. *Id.* ¶ 33.

While at MCCF, Plaintiff was prescribed Imitrex (Sumatriptan) to treat his migraines. *Id.* ¶ 34. Imitrex is an oral medication frequently prescribed to treat severe migraine headaches, and prompt administration at the onset of migraine symptoms helps to relieve those symptoms, including headache, nausea, vomiting, and sensitivity to light and sound. *Id.* ¶ 2, 34. Because the

---

[2] Unless otherwise stated, the background facts are taken from Plaintiff's Amended Complaint, ECF No. 53, and are presumed to be true.

drug is a preventative measure, however, it is effective only when taken at the first sign of a migraine. *Id.* ¶ 34. When Plaintiff receives his Imitrex at the onset of a migraine episode, as his physician instructed, Plaintiff experiences milder symptoms and diminished pain. *Id.* ¶ 36.

During his detention at MCCF, Plaintiff was permitted to seek medical treatment only through MCCF's providers and procedures, meaning that he had to either initiate a "sick call" or, after receiving permission from a correctional officer, travel to MCCF's medical unit in order to request treatment. *Id.* ¶ 37. Plaintiff's medical issues were well-known to the staff at MCCF's medical unit, including to Defendant White,[3] Defendant Sturgess,[4] and the Nurse Defendants who frequently encountered Plaintiff when he sought treatment for his migraines. *Id.* ¶ 38.

On multiple occasions between May 2017 and September 2017, Plaintiff sought treatment at the medical unit at the onset of his migraine symptoms, but the Nurse Defendants failed to timely administer Imitrex to Plaintiff. *Id.* ¶ 40. The Nurse Defendants either delayed his dosage for hours after Plaintiff's migraine symptoms had become severe or denied him access to his medication outright. *Id.* Plaintiff was told on more than one of these occasions that MCCF did not have any Imitrex in stock, despite his prescription and his physician's instructions. *Id.* As a result of having experienced numerous issues in receiving his prescribed migraine medication, Plaintiff sought relief through the MCCF grievance process. *Id.* ¶ 41. Between September 12, 2017, and April 7, 2018, Plaintiff submitted ten or more grievances with MCCF, through which he informed MCCF personnel, including Defendants Sturgess and White, that the Nurse Defendants were not providing proper treatment for Plaintiff's migraines. *Id.*

---

[3] Defendant White was, at all times relevant to this action, an Administrative Nurse Manager at MCCF. ECF No. 53 ¶ 13.
[4] Defendant Sturgess was, at all times relevant to this action, the Health Services Administrator at MCCF. ECF No. 53 ¶ 14.

### ii.       The Events of September 27–28, 2017

Late on the night of September 27, 2017, Plaintiff began experiencing a migraine episode and immediately requested permission to go to the medical unit at MCCF for treatment. *Id.* ¶ 42. When he arrived at the medical unit, Plaintiff explained to the Nurse Defendant on duty that he needed to take Imitrex immediately to prevent a severe migraine headache and the associated symptoms. *Id.* ¶ 43. However, the Nurse Defendant told Plaintiff that he would have to wait to receive his medication until other patients were treated. *Id.* A Nurse Defendant finally provided the Imitrex pill to Plaintiff over three hours after the onset of Plaintiff's symptoms, but then took the pill back when Plaintiff questioned why he had not received his medication sooner. *Id.* As a result of this exchange, a correctional officer took Plaintiff to a holding cell in the medical unit without allowing him to take the Imitrex. *Id.* ¶ 44. Plaintiff was left in the holding cell while he continued to tell the correctional officers and nurses outside the cell that his symptoms were getting worse and that he needed his medication immediately. *Id.*

Thirty minutes after the correctional officer had placed Plaintiff in the holding cell, Defendants Watkins and Brown entered the cell and placed Plaintiff in handcuffs with his hands behind his back.[5] *Id.* ¶ 45. A Nurse Defendant brought Plaintiff his medication while he was in this position. *Id.* Plaintiff requested the handcuffs to be removed so that he could take the Imitrex, but Defendants Watkins and Brown refused. *Id* ¶ 46. Instead, Defendant Watkins elbowed Plaintiff in the throat as Plaintiff stood against the wall and then Plaintiff was force fed the medication and forced to swallow the pill without water. *Id.* ¶¶ 46–47.

After Plaintiff was given his medication, Defendants Watkins and Brown brought him to the segregation unit. *Id.* ¶ 48. Before Plaintiff entered the unit, however, Defendants Watkins and

---

[5] Defendants Watkins and Brown were, at all times relevant to this action, correctional officers at MCCF. ECF No. 53 ¶¶ 9, 11.

Brown ordered Plaintiff to enter the shower area, which had no camera coverage, and told him that he needed to undergo a strip search in order to enter the segregation unit. *Id.* ¶ 48. Defendant Watkins ordered Plaintiff to remove his clothing and, when Plaintiff questioned why a strip search was necessary, did not provide an explanation but instead repeated the instruction.[6] *Id.* ¶ 49. Plaintiff informed Defendant Watkins that he could not physically remove his clothing with his hands still cuffed behind his back. *Id.* ¶¶ 49–50. Defendant Watkins then exited the shower area to retrieve leg shackles while Defendant Brown remained with Plaintiff. *Id.* Defendants Taylor and Beam arrived in the shower area while Defendant Watkins was gone.[7] *Id.* ¶ 50.

When Defendant Watkins returned to the shower area with the leg shackles, he told Plaintiff to turn toward the shower wall and to place his face against the surface. *Id.* ¶ 51. Defendant Watkins then walked up behind Plaintiff, grabbed his head, and slammed Plaintiff face first into the shower wall multiple times.[8] *Id.* Plaintiff still had his hands shackled behind his back and had no way to protect his head from impact. *Id.* Defendants Brown, Taylor, and Beam were all present in the shower area during this incident, but none made any effort to prevent Defendant Watkins from harming Plaintiff or to intervene in the attack. *Id.* ¶ 52.

Defendant Watkins then slammed Plaintiff to the ground while Plaintiff was still dazed, during which time Plaintiff was screaming in pain and bleeding from his head. *Id.* ¶ 53. The other Defendants then pulled Plaintiff upright, and Defendant Watkins unbuttoned Plaintiff's

---

[6] There is not a general policy requiring an inmate to be strip searched prior to entering the segregation unit. ECF No. 53 ¶ 59.

[7] Defendants Taylor and Beam were, at all times relevant to this action, correctional officers at MCCF. ECF No. 53 ¶¶ 10, 12.

[8] Defendant Watkins allegedly has a lengthy history of using unnecessary force against inmates at MCCF. ECF No. 53 ¶ 87 ("Another correctional officer has even complained to Plaintiff that the correctional officer does not like to work with Defendant Watkins because he is abusive to inmates and asks officers to cover for him."); *id.* ¶ 88 (alleging that Plaintiff was previously attacked by Defendant Watkins during a prior detention period in 2012); *id.* ¶ 89 (alleging that "Plaintiff is aware of other inmates at MCCF who have been assaulted either by Defendants Watkins or other correctional officers while at the facility").

jumpsuit and pulled it down off his shoulders so that it was half open. *Id.* ¶ 54. Rather than

conduct a full strip search, however, Defendant Watkins grabbed Plaintiff's genitals through his

boxers. *Id.* The Defendants then buttoned up Plaintiff's jumpsuit and brought Plaintiff into the

segregation unit. *Id.* At no point did any of the Defendants pat Plaintiff down or remove any

other clothing from Plaintiff. *Id.*

Plaintiff was later taken via ambulance to the emergency room at Holy Cross Hospital

Germantown. *Id.* ¶ 60. Plaintiff was treated for a laceration over his right eye, a closed head

injury, and a neck contusion caused by Defendant Watkins' attack. *Id.*

At no time during the events of September 27–28, 2017 did Plaintiff threaten or become

physically aggressive towards any of the Defendants or any other MCCF employee or inmate. *Id.*

¶ 57. Plaintiff did not pose a threat to the safety of any MCCF employee or inmate, nor did he

pose any risk of escape or other criminal violation. *Id.* At all times during the events of

September 27–28, 2017, Plaintiff was complying with MCCF rules and regulations. *Id.*

### iii. The Mental and Physical Toll on Plaintiff of the Events of September 27–28, 2017

On September 29, 30, and 31, 2017, Plaintiff filed sick slips seeking to see a psychiatrist

in the wake of the events of September 27–28, 2017. *Id.* ¶ 62. Plaintiff filed a grievance with the

medical unit when he received no response to his sick slips. *Id.*

Plaintiff saw Defendant Watkins for the first time since the attack on October 20, 2017,

and immediately felt a "rush of fear, causing him to vomit." *Id.* ¶ 63. The same day, Plaintiff

wrote a letter to Deputy Warden Gale Starkey detailing his involuntary response and his fear of

Defendant Watkins. *Id.* The letter also questioned why MCCF had not investigated the attack. *Id.*

On October 22, 2017, Plaintiff received a referral for mental health services. *Id.* ¶ 64. The

referral states that Plaintiff reported being assaulted by a correctional officer and is now suffering

physical and psychological trauma because of the recollection. *Id.* The nurse completing the referral noted that Plaintiff's symptoms "sounded like PTSD." *Id.* Plaintiff subsequently saw a therapist to treat the trauma caused by the attack but was not permitted a second visit despite his requests. *Id.*

Defendant Watkins' attack on Plaintiff, and the accompanying head injuries, also caused Plaintiff's migraine headaches to become more severe. *Id.* ¶ 65.

### iv.  MCCF's Response to Plaintiff's Complaints Regarding Proper Migraine Treatment After the Events of September 27–28, 2017

After the events of September 27–28, 2017, MCCF began to take steps to address Plaintiff's complaints about MCCF's failure to provide proper treatment for his migraines. *Id.* ¶ 66. On October 11, 2017, after failing to respond to the many grievances Plaintiff had filed in September and early October, Defendant White met with Plaintiff to discuss the Nurse Defendants' ongoing failure to follow Plaintiff's physician's instructions and properly treat Plaintiff's migraines. *Id.* ¶ 67. At the meeting, Defendant White agreed to stock additional Imitrex and to permit Plaintiff to keep Imitrex with him on a trial basis. *Id.* Defendant White also agreed to instruct the Nurse Defendants on how to properly administer Imitrex to Plaintiff—*i.e.* to instruct them to give Plaintiff his medication within an hour of the start of a migraine episode. *Id.*

Despite Defendant White's October 11, 2017 promises and other similar promises of adequate care, Nurse Defendants continued to deny Plaintiff proper medical treatment. *Id.* ¶ 68. Consequently, Plaintiff submitted additional grievances that were forwarded to the medical unit. *Id.* However, MCCF continued to provide inadequate medical treatment of Plaintiff's migraines through the end of Plaintiff's detention at MCCF. *Id.* ¶ 69. As a result of the inadequate care, Plaintiff continued to suffer prolonged and severe health issues, including a three-week period

where Plaintiff was totally debilitated, consistently vomited blood and a black substance, and
was unable to keep down food. *Id.*

### v.      MCCF's Investigation of the Events of September 27–28, 2019

On September 29, 2017, Plaintiff submitted a grievance to MCCF stating that he had
been attacked by Defendant Watkins, that he was fearful for his safety, and that he would like to
press charges against Defendant Watkins. *Id.* ¶ 61. Plaintiff was told that the grievance process
was not the appropriate channel for filing charges and that he instead needed to submit a
statement of charges. *Id.* Plaintiff was never permitted to speak with a police officer about the
attack. *Id.*

Sometime after the attack, Defendant Watkins provided a written statement regarding the
incident. *Id.* ¶ 70. Defendant Watkins explained that Plaintiff "had bounced his body and head"
against the wall while handcuffed causing injuries that required emergency room treatment. *Id.*
MCCF accepted Defendant Watkins' account and concluded that no further inquiry was
required. *Id.*

In the months that followed, Plaintiff repeatedly attempted to get MCCF to investigate
the incident and sought to file criminal charges. *Id.* ¶ 71. MCCF staff told Plaintiff that he would
need to request the documents required to file charges, but his requests for such documents were
either ignored or he was referred to another MCCF employee. *Id.*

Because of MCCF's lack of action, Plaintiff eventually wrote a letter describing the
events of September 27–28, 2017 to the Prison Rape Elimination Act ("PREA") auditor
responsible for MCCF, Charles J. Kehoe, and the County Executive of Montgomery County,
Maryland. *Id.* ¶ 73. Mr. Kehoe wrote back on December 6, 2017, stating that he had received

Plaintiff's letter and wanted to meet when he was next at MCCF. *Id.* Plaintiff never received a response from the County Executive. *Id.*

On December 8, 2017, Plaintiff was permitted to draft a statement of criminal charges to be submitted to the District Court of Maryland for Montgomery County. *Id.* ¶ 74. That same day, Plaintiff encountered Defendant Watkins in the hallway. *Id.* Defendant Watkins was aware that Plaintiff had been seeking to file criminal charges against him and, when he saw Plaintiff, Defendant Watkins threatened to take Plaintiff back to the segregation unit shower. *Id.* Plaintiff noted this threat in the statement of charges and submitted an additional grievance to MCCF reporting the threat from Defendant Watkins and explaining that he feared for his safety. *Id.* ¶¶ 74–75. The grievance was returned to Plaintiff as "nongrievable." *Id.* ¶ 75.

On December 13, 2017, Plaintiff met with a PREA auditor visiting MCCF, David Haasenritter, and provided him with the details of the events of September 27–28, 2017. *Id.* ¶ 76. In mid-December 2017, Plaintiff submitted several additional grievances about Defendant Watkins' attack and the lack of response from MCCF, but MCCF took no further action and the grievances were returned to Plaintiff with the explanation that they were duplicate grievances. *Id.* ¶ 77.

On January 18, 2018, Plaintiff filed his Application for Statement of Charges with the District Court of Maryland for Montgomery County, but never received any information from the Court on the application. *Id.* ¶ 78.

On February 24, 2018, Mr. Kehoe wrote to Plaintiff and explained that, as PREA auditors, he and Mr. Haasenritter were not responsible for investigating PREA complaints and that the responsibility lies with the investigators at MCCF. *Id.* ¶ 79. Mr. Kehoe told Plaintiff that he would speak with Sergeant Auen at MCCF and copied Sergeant Auen on the letter. *Id.*

On March 6, 2018, Plaintiff met with Defendants Green,[9] Gilliam,[10] White, and Malagari[11] to discuss various unaddressed grievances, including the grievances relating to Defendant Watkins' attack and Plaintiff's delayed medical treatment. *Id.* ¶ 80. Plaintiff again met with MCCF leadership on April 2, 2018. *Id.* ¶ 81. The attendees of the second meeting included Defendants Malagari, Gilliam, White, and Sturgess, Deputy Warden Starkey, Captain Westbee, and Sergeant Auen. *Id.* During this second meeting, Plaintiff discussed Defendant Watkins' attack, MCCF's provision of inadequate medical care, and MCCF's failure to respond to Plaintiff's grievances. *Id.* In response, Plaintiff was told at the April 2 meeting that—despite Plaintiff's consistent claims to the contrary—the attack by Defendant Watkins was not a "sexual assault" subject to PREA because nothing of a sexual nature occurred. *Id.* ¶ 82 Plaintiff was also told that an investigation was being conducted. *Id.* According to Plaintiff, however, this statement was false. *Id.* Despite all of Plaintiff's letters and grievances, his filing of charges, his letters to PREA auditors, and his face-to-face meetings, MCCF had not even started an investigation by June 2018. *Id.* ¶ 83.[12]

---

[9] Defendant Green was, at all times relevant to this action, the Warden at MCCF or the Director of the Montgomery County Department of Correction and Rehabilitation. ECF No. 53 ¶ 17.

[10] Defendant Gilliam was, at all times relevant to this action, the Deputy Warden at MCCF. ECF No. 53 ¶ 15.

[11] Defendant Malagari was, at all times relevant to this action, the Deputy Warden or the Warden of MCCF. ECF No. 53. ¶ 16.

[12] In the Amended Complaint, Plaintiff describes a June 7, 2018 email written by a Lieutenant Wylie that supports Plaintiff's claims regarding the inadequate response to his grievances. ECF No. 53 ¶ 83. In the email, Lieutenant Wylie wrote:

> This PREA case is going to look very bad on the database and in my written PREA report given the date of the infraction (09/28/2017), when Rico first reported the PREA allegation (10/03/2017), and today's date (06/07/2018) that I am starting the investigation.
>
> He clearly wrote in several letters (over the past several months) to numerous staff that Sgt. Watkins grabbed his genitals! He also sent letters out to our last PREA auditors notifying them of the allegation and he further states that he verbally told Warden Malagari about the alleged PREA assault back on April 2.
>
> This case should have been assigned to a PREA investigator way back.

*Id.*

On June 20, 2018, almost nine months after Defendant Watkins attacked Plaintiff, Plaintiff finally received a PREA Inmate Notification Form from Lieutenant Wylie stating that his allegations were "unfounded." *Id.* ¶ 84. The report continued that, because "there are no video cameras that show inside the showers," the investigation relied solely on the witness accounts of Plaintiff and Defendants Watkins, Beam, Taylor, and Brown for all findings of fact. *Id.* According to the report, Defendants Beam, Taylor, and Brown were interviewed and stated that they did not see Defendant Watkins grab Plaintiff's genitals. *Id.* ¶ 85. In Defendant Watkins' interview, he stated that, not only did he not touch Plaintiff's genitals, but Defendant Brown was the one to conduct the strip search. *Id.* Defendant Brown was apparently then interviewed a second time, and only this time did he state that he was the one to conduct the strip search. *Id.*

In July 2018, Plaintiff was transferred from MCCF to the MCTC. ECF No. 56-1 ¶ 10. Plaintiff was subsequently released, under supervision, from MCTC. *Id.* ¶ 10.

**B.     Procedural History**

On June 27, 2018, Plaintiff, proceeding *pro se*, filed separate 42 U.S.C. § 1983 civil rights complaints against Robert Green, Susan Malagari, Sergeant Christopher Auen, Eric Watkins, and Robin White. ECF No. 1 in Civil Action Nos. GJH-18-1949, GJH-18-1950, GJH-18-1951, GJH-18-1952, GJH-18-1953. Plaintiff claimed that each defendant violated his constitutional rights while he was housed in MCCF from 2017 to 2018 and sought declaratory and injunctive relief, as well as monetary damages. *Id.* Subsequently, Defendant Green, Defendant Malagari, Sergeant Auen, and Defendant White each filed Motions to Dismiss. GJH-18-1949, ECF No. 14; GJH-18-1950, ECF No. 10; GJH-18-1951, ECF No. 13; GJH-18-1953, ECF No. 17. Defendant Watkins, meanwhile, filed a Partial Motion to Dismiss and a Partial Answer. GJH-18-1952, ECF Nos. 11, 12.

The Court, in a Memorandum Opinion and Order issued August 6, 2019, determined that the cases were best considered together for the purpose of dispositive review and, in the interest of judicial economy, consolidated the cases into GJH-18-1949. ECF No. 32 at 3;[13] ECF No. 33 at 2. The Court also dismissed Plaintiff's claims for declaratory and injunctive relief as moot since Plaintiff was no longer housed at MCCF. ECF No. 32 at 8; ECF No. 33 at 2. Finally, the Court ordered that Plaintiff be appointed counsel and instructed Defendants to file an Answer to the consolidated Complaint or a renewed dispositive motion within fourteen days of the Order. ECF No. 33 at 2–3.

Defendants filed a Motion to Dismiss Plaintiff's Complaint, or in the Alternative, for Summary Judgment, on September 5, 2019. ECF No. 35. The Court appointed Plaintiff pro bono counsel on September 10, 2019. ECF No. 39. Plaintiff's new counsel then filed a Motion for Leave to File Amended Complaint on January 8, 2020, which removed Sergeant Auen as a Defendant, but added Defendants Taylor, Beam, Brown, Gilliam, Sturgess, Jane Doe Nurses, and Montgomery County, Maryland. ECF No. 46; ECF No. 46-2. The Amended Complaint also clarified Plaintiff's § 1983 and state law claims. ECF No. 46-2 at 22–23. On May 29, 2020, the Court granted Plaintiff's Motion to File Amended Complaint and dismissed Defendants' September 5, 2019 Motion to Dismiss as moot. ECF No. 52 at 4.

Consequently, the Amended Complaint, which is now the operative complaint, was docketed as ECF No. 53 on the same day. The Amended Complaint includes thirteen total claims: (1) a 42 U.S.C. § 1983 claim against Defendant Watkins for use of excessive force in violation of the Fourteenth Amendment of the United States Constitution (Count I), *id.* at 21–22; (2) a common law assault claim against Defendant Watkins (Count II), *id.* at 22–23; (3) a

---

[13] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

12

common law battery claim against Defendant Watkins (Count III), *id.* at 23–24; (4) a common law intentional infliction of emotional distress claim against Defendant Watkins (Count IV), *id.* at 24; (5) a 42 U.S.C. § 1983 claim against Defendants Taylor, Brown, and Beam for failure to protect or intervene (Count V), *id.*; (6) a 42 U.S.C. § 1983 claim against Defendants Watkins, Brown, Taylor, and Beam for unreasonable search in violation of the Fourth Amendment of the United States Constitution (Count VI), *id.* at 25; (7) a 42 U.S.C. § 1983 claim against Defendant Watkins for retaliation in violation of the First Amendment of the United States Constitution (Count VII), *id.* at 25–26; (8) a 42 U.S.C. § 1983 claim against Nurse Defendants for denial of adequate medical care in violation of the Eighth Amendment of the United States Constitution (Count VIII), *id.* at 26–27; (9) a 42 U.S.C. § 1983 claim against Defendants White and Sturgess alleging supervisory liability for denial of adequate medical care (Count IX), *id.* at 27–28; (10) a common law negligent retention and supervision claim against Defendants Malagari, Green, Gilliam, and Montgomery County (Count X), *id.* at 28–30; (11) a 42 U.S.C. § 1983 claim against Defendants Malagari, Green, and Gilliam alleging supervisory liability for excessive force and unreasonable search (Count XI), *id.* at 30; (12) a 42 U.S.C. § 1983 claim against Montgomery County for having an unofficial policy or custom of allowing correctional officers to abuse inmates and apply excessive force without consequence (Count XII), *id.* at 30–31; and (13) a 42 U.S.C. § 1983 claim against Montgomery County for failure to train, supervise, or discipline (Count XIII), *id.* at 31.

On June 19, 2020, Defendants filed the Motion to Dismiss, or in the Alternative, for Summary Judgment ("Motion to Dismiss") at issue here. ECF No. 55. Plaintiff responded in opposition on July 10, 2020, ECF No. 56, and Defendants replied on July 24, 2020, ECF No. 57. Plaintiff then filed a Motion for Waiver of Notice Requirement Pursuant to the Local

13

Government Tort Claims Act on August 21, 2020. ECF No. 58. Although Plaintiff notes in the Motion for Waiver that Defendants oppose the Motion, *id.* at 2, Defendants did not file a response.

## II. MOTION FOR WAIVER OF NOTICE REQUIREMENT PURSUANT TO THE LOCAL GOVERNMENT TORT CLAIMS ACT

Because the outcome of Plaintiff's Motion for Waiver of Notice Requirement Pursuant to the Local Government Tort Claims Act ("Motion for Waiver") is relevant to one of the arguments in Defendants' Motion to Dismiss discussed below, *see infra* § III.B.i, the Court considers the Motion for Waiver first and, for good cause shown, grants Plaintiff's Motion.

Under the Local Government Tort Claims Act ("LGTCA"), a local government in Maryland is liable "for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government." Md. Code Ann., Cts. & Jud. Proc. § 5-303(b)(1). Plaintiff's compliance with the LGTCA's notice requirement, however, is generally a prerequisite for such tort liability. *Hisp. Nat'l Law Enf't Ass'n NCR v. Prince George's Cty.*, No. TDC-18-3821, 2020 WL 903205, at *6 (D. Md. Feb. 25, 2020).

The LGTCA's notice requirement provides that "an action for unliquidated damages may not be brought against a local government or its employees unless the notice of the claim required by this section is given within 1 year after the injury." Md. Code. Ann., Cts. & Jud. Proc. § 5-304(b)(1). Written notice must be provided "in person or by certified mail, return receipt requested," and state the "time, place, and cause of the injury." *Id.* § 5-304(b)(2), (c)(1). When the defendant local government is Montgomery County, "the notice shall be given to the County Executive[.]" *Id.* § 5-304(c)(3)(ii). "The notice requirement of the LGTCA is a condition precedent to maintaining a tort action for damages, such that a suit under the LGTCA is 'fatally

flawed if the condition is not satisfied.'" *Hisp. Nat'l Law Enf't Ass'n NCR*, 2020 WL 903205, at *6 (quoting *Rios v. Montgomery Cty.*, 872 A.2d 1, 14 (Md. 2005)). Thus, plaintiffs are required to plead compliance with the notice provision of the LGTCA in their complaint, and failure to so plead will subject a plaintiff's claims to dismissal. *Id.*

Nevertheless, there are circumstances when compliance with the notice requirement of the LGTCA is not necessary. The notice requirement does not apply if "within 1 year after the injury, the defendant local government has actual or constructive notice of: (1) The claimant's injury; or (2) The defect or circumstances giving rise to the claimant's injury." Md. Code Ann., Cts. & Jud. Proc. § 5-304(e). Additionally, the Court of Appeals of Maryland has held that "strict compliance with the notice provisions of the LGTCA is not always required; substantial compliance may suffice." *Moore v. Norouzi*, 807 A.2d 632, 643 (Md. 2002) (describing substantial compliance as "when the purpose of the LGTCA has been achieved, even though not all of the details prescribed have been complied with"). Finally, as relevant here, "unless the defendant can affirmatively show that its defense has been prejudiced by lack of required notice, upon motion and good cause shown the court may entertain the suit even though the required notice was not given." Md. Code Ann., Cts. & Jud. Proc. § 5-304(d).

The test for whether good causes exists under Md. Code Ann., Cts. & Jud. Proc. § 5-304(d) is whether the plaintiff pursued the claim "with the degree of diligence that an ordinarily prudent person would have exercised under the same or similar circumstances." *Heron v. Strader*, 761 A.2d 56, 63 (Md. 2000). "Good cause can include excusable neglect or mistake, serious physical or mental injury, the plaintiff's location out of state, the inability to retain counsel in a complex case, ignorance of the statutory requirement, or misleading representations by government representatives." *Hisp. Nat'l Law Enf't Ass'n NCR*, 2020 WL 903205, at *8.

15

Ultimately, however, "[t]he question of whether there is good cause to waive the notice requirement [under Md. Code Ann., Cts. & Jud. Proc. § 5-304(d)] is within the discretion of the trial court." *Moore*, 807 A.2d 632 at 641.

In the Amended Complaint, Plaintiff pleads that he provided notice as required under the LGTCA, Md. Code Ann., Cts. & Jud. Proc. § 5-304(e), as "Defendant Montgomery County had constructive notice of Plaintiff's injury and the circumstances giving rise to Plaintiff's injury." ECF No. 53 ¶ 28. Nevertheless, Defendants argue in their Motion to Dismiss that the Court should dismiss Plaintiff's common law claims in Counts II, III, IV, and X—all four counts relating to the events of September 27–28, 2017 and Defendants Watkins' attack on Plaintiff— because Plaintiff did not provide the requisite notice pursuant to the LGTCA. ECF No. 55 at 6–7. Plaintiff responds in his Opposition that his substantial compliance with the LGTCA's notice requirement and his persistent efforts to raise his claims with Montgomery County more than suffice, and there is no basis under the LGTCA to dismiss Plaintiff's state law claims. ECF No. 56 at 14–16. However, Plaintiff then filed this Motion for Waiver as an alternative basis to resolve the LGTCA notice issue. ECF No. 58 at 1. Defendants have not filed an opposition to the instant Motion for Waiver.

Plaintiff has diligently pursued his state law claims, which are the claims subject to the notice requirements of the LGTCA. Plaintiff filed numerous grievances at MCCF related to Defendant Watkins' attack, filing the first grievance the day after the attack. ECF No. 53 ¶¶ 61, 71, 77. Plaintiff attempted to file criminal charges against Defendant Watkins. *Id.* ¶¶ 71, 74, 78. Plaintiff wrote a letter describing the events of September 27–28, 2017 to the PREA auditor responsible for MCCF, Charles J. Kehoe, and later met with a different PREA auditor. *Id.* ¶¶ 73, 76. Plaintiff wrote a letter describing the events of September 27–28, 2017 to the County

Executive of Montgomery County, Maryland. *Id.* ¶ 73; ECF No. 56-1 ¶ 4.[14] Defendant met with MCCF leadership in March and April of 2018 to discuss Defendant Watkins' attack and MCCF's failure to respond to Plaintiff's grievances related to the attack. ECF No. 53 ¶¶ 80–82. Finally, Defendant filed numerous lawsuits in state and federal court, including the instant action. ECF No. 58-1 at 2.

If the letter Plaintiff sent to the County Executive of Montgomery County had been sent by certified mail, the letter would have constituted strict compliance with the LGTCA notice requirement. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-304(b)(2), (c)(1), (c)(3)(ii). Plaintiff's letter was not sent by certified mail, however, due to MCCF's policy of not allowing inmates access to certified mail and MCCF's repeated denials of Plaintiff's requests to access certified mail for the purposes of pursuing his claims. ECF No. 56-1 ¶ 3. This alone is a sufficient basis on which to grant Plaintiff's motion. An ordinarily prudent person under the circumstances of this case—*i.e.*, an ordinarily prudent pretrial detainee—would not be able to send notice to the County Executive by certified mail when the facility at which that person was detained did not permit access to certified mail. Additionally, it seems reasonable that an ordinarily prudent person in such circumstances would attempt to send notice via standard mail, as Plaintiff did here, ECF No. 56-1 ¶¶ 3, 4, in order to fulfill the underlying purpose of the LGTCA notice requirement—which is "to have the claimant furnish the municipal body with sufficient information to permit it to make an investigation in due time sufficient to ascertain the character and extent of the injury and its responsibility in connection with it." *Moore*, 807 A.2d at 647

---

[14] Defendants attach the affidavit of Sara Mansoury to their Motion to Dismiss, which states that "[p]rior to March 15, 2019, the County did not have any LGTCA notices from, or concerning, Michael Rico, identifying a claim or injuries because of an incident that occurred on September 27, 2017 or during his detention at MCCF." ECF No. 55-2. At most, Ms. Mansoury's affidavit presents an issue of fact as to whether Plaintiff's letter to the County Executive was received or properly recorded but does not directly rebut Plaintiff's allegations that he attempted to send such a letter.

(quoting *Grubbs v. Prince George's Cty.*, 297 A.2d 754, 756 (Md. 1972)).[15] Finally, Defendants

have not responded to Plaintiff' Motion for Waiver and thus have not met their burden of

"affirmatively show[ing] that [their] defense has been prejudiced by lack of required notice[.]"

Md. Code Ann., Cts. & Jud. Proc. § 5-304(d). Thus, the Court finds good cause to grant

Plaintiff's Motion for Waiver.[16]

## III.  MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

### A.      Standard of Review

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft

v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678.

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Id*. (citing *Twombly*, 550 U.S. at 555 ("a plaintiff's obligation to

provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions,

and a formulaic recitation of the elements of a cause of action will not do")).

---

[15] Plaintiff's letter sent to the County Executive by standard mail—if received—would likely also constitute substantial compliance, such that Plaintiff's claims could proceed despite the absence of strict compliance. *See Faulk v. Ewing*, 808 A.2d 1262, 1272 (Md. 2002) ("Where the purpose of the notice requirements is fulfilled, but not necessarily in a manner technically compliant with all of the terms of the statute, this Court has found such substantial compliance to satisfy the statute. Substantial compliance requires some effort to provide the requisite notice and, in fact, it must be provided, albeit not in strict compliance with the statutory provision." (internal quotation marks and citation omitted)). This further supports the Court's finding of good cause since the Court of Appeals of Maryland has held that substantial compliance with the LGTCA may also constitute a waiver of notice. *Moore*, 807 A.2d at 647–48.

[16] The Court's conclusion that there is good cause to grant Plaintiff's Motion for Waiver is further strengthened by Plaintiff's affidavit stating that, prior to his transfer from MCCF, he sought pro bono representation from multiple law firms in an effort pursue his claims, but his efforts were unsuccessful. ECF No. 56-1 ¶ 9. "[T]he inability to retain counsel in cases involving complex litigation" is one of the circumstances where courts have found good cause to waive the LGTCA's notice requirements. *Heron*, 761 A.2d at 63.

The purpose of Rule 12(b)(6) "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (citation and internal quotation marks omitted). When deciding a motion to dismiss under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint[,]" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations and internal quotation marks omitted). The Court need not, however, accept unsupported legal allegations, *see Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

If the Court considers materials outside the pleadings, the Court must treat a motion to dismiss as one for summary judgment. Fed. R. Civ. P. 12(d). When the Court treats a motion to dismiss as a motion for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* When the moving party styles its motion as a "Motion to Dismiss, or in the Alternative, for Summary Judgment," as is the case here, and attaches additional materials to its motion, the nonmoving party is, of course, aware that materials outside the pleadings are before the Court, and the Court can treat the motion as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). Further, the Court is not prohibited from granting a motion for summary judgment before the commencement of discovery. *See* Fed. R. Civ. P. 56(a) (stating that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to

19

any material fact" without distinguishing pre-or post-discovery).

Summary judgment is appropriate if "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c), show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). If the moving party demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify specific facts showing that there is a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 322–23. A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) (citation omitted). When ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

While the Court may rule on a motion for summary judgment prior to commencement of discovery, *see, e.g.*, *Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 286 (2d Cir. 2000), Federal Rule of Civil Procedure 56(d) "mandates that summary judgment be denied when

the nonmovant has not had the opportunity to discover information that is essential to his opposition." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014) (internal citation and quotation marks omitted). To obtain Rule 56(d) relief, the non-moving party bears the burden of showing how discovery "could possibly create a genuine issue of material fact sufficient . . . to survive summary judgment, or otherwise affect the court's analysis." *Poindexter v. Mercedes-Benz Credit Corp.*, 792 F.3d 406, 411 (4th Cir. 2015) (internal citation and quotation marks omitted).

## B.    Discussion

In his Amended Complaint, Plaintiff brings thirteen claims against eleven Defendants. ECF No. 53. Defendants argue in their Motion to Dismiss that for various reasons twelve of these claims should be dismissed in their entirety.[17] The Court will first address two arguments that apply to multiple claims against various defendants: (1) the Court should dismiss Plaintiff's state law claims, Counts I, III, IV, and X, because Plaintiff failed to give requisite notice pursuant to the LGTCA, ECF No. 55-1 at 15–16; and (2) the Court should dismiss, for failing to exhaust administrative remedies, (a) Count VII against Defendant Watkins, *id.* at 23–24, (b) Counts V and VI against Defendants Taylor, Brown, and Beam, *id.* at 20–21, (c) Count IX against Defendants White and Sturgess, *id.* at 21–23, and (d) Count X and XI against Defendants Malagari, Green, and Gilliam, *id.* at 23. The Court will then address the Defendants' remaining arguments organized by the Defendant or Defendants to whom each argument pertains.

### i.    The Notice Requirement of the LGTCA

Defendants argue that Plaintiff's state law claims—Plaintiff's assault, battery, and intentional infliction of emotion distress claims against Defendant Watkins (Counts II, III, and IV) and Plaintiff's negligent retention and supervision claim against Defendants Malagari,

---

[17] The Motion to Dismiss does not address Count VIII, Plaintiff's § 1983 claim against Nurse Defendants for inadequate medical care in violation of the Eighth Amendment of the United States Constitution.

Green, Gilliam, and Montgomery County (Count X)— "must be dismissed because Plaintiff did not comply with the notice requirement under the Local Government Tort Claims Act." ECF No. 55-1 at 15. However, as discussed above, *see supra* § II, the Court has granted Plaintiff's Motion for Waiver of Notice Requirement Pursuant to the Local Government Tort Claims Act, ECF No. 58. Thus, the Court will not dismiss Counts II, III, IV, and X on the basis of Plaintiff's alleged failure to comply with the notice requirement of the LGTCA. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-304(d).

### ii.   Exhaustion of Administrative Remedies

Defendants assert that the Court must dismiss, as a matter of law, four categories of claims for non-exhaustion pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e: (1) Plaintiff's retaliation claim against Defendant Watkins (Count VII), ECF No. 55-1 at 23–24; (2) Plaintiff's § 1983 claims against Defendants Taylor, Brown, and Beam for failure to protect or intervene (Count V), *id.* at 20–21, and unreasonable search in violation of the Fourth Amendment (Count VI), *id.* at 24–25; (3) Plaintiff's § 1983 claim of supervisor liability for inadequate medical care against Defendants White and Sturgess (Count IX), *id.* at 21–23; and (4) Plaintiff's negligent retention and supervision (Count X) and § 1983 supervisor liability for excessive force and unreasonable search (Count XI) claims against Defendants Malagari, Green, and Gilliam, *id.* at 23.

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Jones v. Bock*, 549 U.S. 199, 215–216 (2007); *Anderson v. XYZ Corr.l Health Services, Inc.*, 407 F.3d 674, 682 (4th Cir. 2005). Thus, the Court will consider Defendants'

exhaustion arguments under the Motion for Summary Judgment standard. *Allen v. W. Corr. Inst.*, No. ELH-15-3498, 2017 WL 3607821, at *15 (D. Md. Aug. 21, 2017) ("In general, courts do not resolve contests surround the facts, the merits of a claim, or the applicability of defenses through a Rule 12(b)(6) motion." (internal quotation marks and citations omitted)).

Below, the Court first reviews the requirements of PLRA, and then, applying PLRA's requirements to the instant case, discusses whether there is a genuine dispute of material fact regarding whether Plaintiff has exhausted his administrative remedies as to each category of claims addressed in Defendants' exhaustion argument.

### a.      The Prisoner Litigation Reform Act ("PLRA")

The Prisoner Litigation Reform Act provides, in pertinent part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." *Id.* § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F. Supp. 2d 523, 527 (D. Md. 2003), *aff'd*, 98 Fed. App'x 253 (4th Cir. 2004).

Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). Additionally, an inmate must complete the prison's internal appeals process before bringing suit.

23

*See Jones*, 549 U.S. at 202–03 (noting the PLRA requires prisoners to exhaust prison grievance procedures before filing suit); *see also Girard v. Chuttey*, 826 F. App'x 41, 44–45 (2d Cir. 2020) ("Because Girard filed his initial complaint in this action before the CORC had either decided his appeal or the thirty-day period to respond had elapsed, he failed to exhaust his remedies as to this grievance."); *Mitchell v. Bishop*, No. CV PX-18-933, 2019 WL 4059902, at *4 (D. Md. Aug. 28, 2019) ("Nor can [the plaintiff] save the claims by exhausting administrative remedies while this case is pending."); *cf. Chase*, 286 F. Supp. 2d at 530 ("The critical question is not whether the Maryland prisoner grievance process currently is available to Chase, but rather whether those remedies were available to him on July 22, 1998, at the time when he filed this suit in federal court.").

A claim that has not been exhausted may not be considered in court—*i.e.*, "exhaustion is mandatory." *Jones*, 549 U.S. at 211, 220; *see also Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016) ("The mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion[.]" (quoting *Miller v. French*, 530 U.S. 327, 337 (2000))). However, "that edict contains one significant qualifier: the remedies must indeed be 'available' to the prisoner." *Ross*, 136 S. Ct. at 1856; *see* 42 U.S.C. § 1997e(a).

An administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 136 S. Ct. at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). The *Ross* Court, however, identified three kinds of circumstances in which an administrative remedy is unavailable, and an inmate's duty to exhaust available remedies "does not come into play." *Id*. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an

24

administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

### b.   Application of PLRA to the Instant Case

#### 1.   Count VII: Retaliation Claim Against Defendant Watkins

Defendants argue that Plaintiff's claim of retaliation against Officer Watkins fails "because of Plaintiff's failure to exhaust administrative remedies." ECF No. 55-1 at 23. Specifically, Defendants claim that "Plaintiff should have filed a grievance for the alleged retaliatory statement made by Officer Watkins on December 7, 2017[,]" but "Plaintiff did not do so and never initiated the grievance for the alleged retaliation." *Id.* Defendants' argument— theoretically supported by the absence of such a grievance from the 42 grievances attached to its Motion to Dismiss, *see* ECF Nos. 55-4 through 55-45—directly contradicts Plaintiff's declaration, attached to his Opposition, which states: "On December 8, 2017, I submitted a grievance related to retaliatory threats by Defendant Watkins. That grievance [was] also returned to me as 'non-grievable.'"[18] ECF No. 56-1 ¶ 6. Moreover, Defendants never make any claim that the bevy of grievances attached to their motion is the full universe of such grievances filed by Plaintiff, and Plaintiff specifically claims that it is not. ECF No. 56-1 ¶ 11 ("I reviewed the grievances submitted by Defendants, and I am aware of at least three grievances that were not included as part of Defendant's submission.").

---

[18] This statement is consistent with the allegations in the Amended Complaint that "Plaintiff submitted an additional grievance on December 8, 2017, reporting the threat from Defendant Watkins and explaining that he fears for his safety" and that "[t]he grievance was returned to Plaintiff as 'nongrievable[,]'" ECF No. 53 ¶ 75.

The Court, drawing all justifiable inferences in Plaintiff's favor, *Anderson*, 477 U.S. at 255, finds a genuine dispute as to whether Plaintiff submitted a grievance regarding Defendant Watkins' retaliatory threat and whether that grievance was returned as non-grievable. Thus, there is a genuine issue of material fact since, if the grievance was submitted and returned as non-grievable, Plaintiff has exhausted his administrative remedies;[19] whereas, if no grievance was submitted, Plaintiff's retaliation claim must be dismissed for failure to exhaust administrative remedies. *Spriggs*, 242 F.3d at 183 (clarifying that a material fact is one that "might affect the outcome of the suit under the governing law" (quoting *Anderson*, 477 U.S. at 248)). Consequently, the Court denies Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment as to the issue of whether Plaintiff exhausted his administrative remedies before bringing his retaliation claim against Defendant Watkins.

This conclusion is reinforced by Plaintiff's declaration that: "Discovery in this lawsuit would be necessary for [Plaintiff] to make a full showing regarding any purported failure to exhaust MCCF grievance procedures before filing suit, including regarding MCCF's files related to my grievances and its grievance procedures." ECF No. 56-1 ¶ 12.  As discussed above, *see supra* § III.A, Fed. R. Civ. P. 56(d) "mandates that summary judgment be denied when the nonmovant has not had the opportunity to discover information that is essential to his opposition." *Pisano*, 743 F.3d at 931 (internal citation and quotation marks omitted). However, to obtain Rule 56(d) relief, the non-moving party must show how discovery "could possibly create a genuine issue of material fact sufficient . . . to survive summary judgment, or otherwise affect the court's analysis." *Poindexter*, 792 F.3d at 411 (internal citation and quotation marks

---

[19] The Montgomery County Department of Correction and Rehabilitation Inmate Guidebook states: "If a Supervisor or staff member indicates the complaint is non-grievable at any stage, whether you agree or disagree, the grievance ends at that point." ECF No. 57-1 at 3 (emphasis omitted).

omitted). "Generally, such an attempt is made through the filing of a Rule 56(d) affidavit that outlines the need for discovery and what additional facts litigants hope to uncover through discovery to properly defeat summary judgment." *Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 F. App'x 552, 561 (4th Cir. 2015). Yet, where "'the nonmoving party's objections before the district court served as the functional equivalent,' a Rule 56(d) affidavit may not be necessary." *Id.* (quoting *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244–45 (4th Cir. 2002)). Plaintiff's Declaration, as it relates to what discovery Plaintiff needs on the issue of exhaustion, is the equivalent of a Rule 56(d) affidavit because it provides reasonable notification and explanation for why more time for discovery is necessary and what Plaintiff intends to discover that is not yet in the record. *Id.* Thus, as to Plaintiff's retaliation claim against Defendant Watkins (Count VII), summary judgment on exhaustion grounds is inappropriate under Fed. R. Civ. P. 56(d). *See Pisano*, 743 F.3d at 931 ("A court should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant.").

### 2. Counts V and VI: § 1983 Claims Against Defendants Taylor, Brown, and Beam

Defendants argue that Plaintiff has failed to exhaust his administrative remedies with respect to his claims against Defendants Taylor, Brown, and Beam because "none of Plaintiff's grievances reference his claims that Defendants Taylor, Brown, and Beam failed to intervene or protect Plaintiff from Officer Watkins' alleged attack or that Defendants Taylor, Brown, and Beam unlawfully searched him." ECF No. 55-1 at 20–21. Defendants exhaustion argument is again, in theory, supported by the absence of a grievance specifically naming Defendants Taylor, Brown, and Beam from the 42 grievances attached to Defendants' Motion to Dismiss. *See* ECF Nos. 55-4 through 55-45. However, as discussed previously, Defendants never claim that the

grievances attached to their motion represent the full universe of such grievances filed by Plaintiff, and Plaintiff alleges that they are not. ECF No. 56-1 ¶ 11.

First, PLRA does not require Plaintiffs to specifically name Defendants in grievances. *Jones*, 549 U.S. at 218. Instead, the Supreme Court has held that, to properly exhaust administrative remedies under PLRA, prisoners must "'complete the administrative review process in accordance with the applicable procedural rules,' rules that are defined not by the PLRA, but by the prison grievance process itself." *Id.* (quoting *Woodford*, 548 U.S. at 84). Thus, the Court turns to MCCF's grievance procedure, submitted by Defendants in their Reply, and finds that the grievance procedure requires only that the prisoner "[b]e clear, [and] describe in detail the issue/problem" but does not require the inmate to specifically name the correctional officers or prison employees involved in the Complaint. *See* ECF No. 57-1 at 3 (outlining the steps of MCCF's grievance procedure and not including a requirement that the inmate specifically name the officers in question).

The Court next evaluates the evidence presented by the parties, drawing all justifiable inferences in Plaintiff's favor, *Anderson*, 477 U.S. at 255, to determine whether there is a dispute of material fact as to whether Plaintiff exhausted his administrative remedies as to his claims against Defendants Taylor, Brown, and Beam. First, the Court observes that Defendants submitted a grievance form on September 28, 2017, that states Plaintiff was attacked by Defendant Watkins, there were witnesses, and this incident took place during an inappropriate strip search. ECF No. 55-10. This grievance, although not a model of clarity, likely serves the purpose of exhaustion; namely, it put the prison on notice that Plaintiff was the subject of an unreasonable search and that Plaintiff was assaulted in front of witnesses who presumably did nothing to stop the assault. *Jones*, 549 U.S. at 219 ("We have identified the benefits of

exhaustion to include allowing a prison to address complaints about the program it administers before being subjected to suit[.]"). Although Defendants Taylor, Brown, and Beam were not specifically identified, prison officials likely could identify the officers with Defendant Watkins at the time Plaintiff was attacked.[20]

Additionally, Plaintiff claims in his declaration, under penalty of perjury, that he submitted a grievance on September 29, 2017 detailing the events of September 27–28, 2017, including the assault and inappropriate search, and was "informed that the matter was non-grievable" and that his remedy was to press charges. ECF No. 56-1 ¶ 5. Under MCCF's grievance procedure, "[i]f a supervisor or staff member indicates the complaint is non-grievable at any stage . . . the grievance ends at that point[,]" regardless of whether the inmate agrees. Thus, Plaintiff's September 29, 2017 grievance would satisfy the exhaustion requirement or, at least, indicate that the grievance procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief" as to any of Plaintiff's complaints regarding the events of September 27–28, 2017. *Ross*, 136 S. Ct. at 1859.

Thus, the Court finds a genuine dispute as to whether Plaintiff has exhausted his administrative remedies with regard to his claims against Defendants Taylor, Brown, and Beam and denies Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment as to

---

[20] To the extent that Defendants argue in their Reply that Plaintiff signing off on the October 10, 2017 response to his September 28, 2017 grievance means he did not exhaust his administrative remedies, the Court finds this argument unpersuasive. ECF No. 57 at 2–3; *see* ECF No. 55-10. MCCF's response was that the "matter is under investigation[,]" ECF No. 55-10, and it is unclear to the Court what other action the Plaintiff should have taken instead of signing off, assuming Plaintiff believed that the matter was actually under investigation. Moreover, since months later Plaintiff met with MCCF leadership to discuss his outstanding grievances regarding the September 27–28 assault, it appears Plaintiff's grievance had not actually been addressed despite what MCCF's response on the grievance form stated and that Defendants were operating outside their own grievance process. *See* ECF No. 56-1 ¶ 8; *see Small v. Camden Cty.*, 728 F.3d 265, (3d Cir. 2013) (holding that failing to appeal from a non-decision did not require the dismissal of inmates claims for non-exhaustion under PLRA).

the issue of whether Plaintiff exhausted his administrative remedies before bringing his § 1983 claims for failure to protect or intervene and unreasonable search.

This conclusion is again reinforced by Plaintiff's declaration that: "Discovery in this lawsuit would be necessary for [Plaintiff] to make a full showing regarding any purported failure to exhaust MCCF grievance procedures before filing suit, including regarding MCCF's files related to my grievances and its grievance procedures." ECF No. 56-1 ¶ 12. As discussed above, *see supra* § III.B.ii.b.1, Plaintiff's Declaration, as it relates to what discovery Plaintiff needs on the issue of exhaustion, is the equivalent of a Rule 56(d) affidavit because it provides reasonable notification and explanation for why more time for discovery is necessary and what Plaintiff intends to discover that is not yet in the record. *Dave & Buster's, Inc.*, 616 F. App'x at 561. Thus, summary judgment on exhaustion grounds—as to Plaintiff's § 1983 claims against Defendants Taylor, Brown, and Beam (Counts V and VI)—is inappropriate under Fed. R. Civ. P. 56(d). *See Pisano*, 743 F.3d at 931.

Because failure to exhaust is Defendants' only argument against Plaintiff's failure to protect or intervene claim (Count V), the Court denies Defendants' Motion as to Count V.

### 3.    Count IX: § 1983 Supervisor Liability for Inadequate Medical Care Claim Against Defendants White and Sturgess

Defendants argue that "Plaintiff did not exhaust his claims of supervisory liability against Defendants White and Sturgess because he did not exhaust his administrative remedies that the nurses failed to provide him with timely medications." ECF No. 55-1 at 21. Again, Defendants' exhaustion argument is unpersuasive.

Both Defendants and Plaintiff agree that during his time at MCCF Plaintiff filed numerous grievances related to the provision of inadequate medical care. ECF No. 55 at 21–22; ECF No. 56-1 ¶ 7. Defendants have attached several of these grievances—although potentially

not all of them, ECF No. 56-1 ¶ 11—to their Motion to Dismiss. ECF No. 55-8; ECF No. 55-9;

ECF No. 55-11; ECF No. 55-12; ECF No. 55-14; ECF No. 55-15; ECF No. 55-16; ECF No. 55-

17; ECF No. 55-21; ECF No. 55-23; ECF No. 55-24. However, the parties disagree as to the

consequences of such grievances. Defendants argue that because Plaintiff failed to complete an

appeal or submit additional grievances, Plaintiff has not exhausted his administrative remedies.

*See* ECF No. 55-1 at 22. Whereas, Plaintiff claims that the grievances are evidence that he

exhausted his administrative remedies or, failing that, evidence that the administrative remedy

procedure was not available to Plaintiff. ECF No. 56 at 21–22.

The Court finds, based on the sample of grievances before it, that Plaintiff's failure to

administratively appeal, or to continuously file grievances until the end of his incarceration at

MCCF, does not require the Court to dismiss Plaintiff's claim for failure to exhaust. MCCF,

specifically Defendant White, responded to each of Plaintiff's grievances with a response that

was facially favorable to Plaintiff. *See* ECF Nos. 55-8 (describing an October 11, 2017 meeting

between Defendant White and Plaintiff in which a plan of action was created that addressed

Plaintiff's concerns); ECF No. 55-9 (references October 11, 2017 meeting); ECF No. 55-11

(same); ECF No. 55-12 (same); ECF No. 55-14 (same); ECF No. 55-15 (same); ECF No. 55-16

(same); ECF No. 55-17 (same); ECF No. 55-21 (Plaintiff states that the meeting on April 2, 2018

covered his grievance); ECF No. 55-23 (states Nurse Manager will explore further and discuss

with staff involved); ECF No. 55-24 (same). However, despite the return of Plaintiff's grievances

with favorable responses and Plaintiff's signature accepting the proposed plans of action,

Plaintiff declares under penalty of perjury that he "continued to experience inadequate medical

treatment." ECF No. 56-1 ¶ 7.

An inmate is "not obligated to pursue an administrative appeal" after "receiving a favorable outcome on the merits of his grievance at a lower step in the process[.]" *Toomer v. BCDC*, 537 F. App'x 204, 206 (4th Cir. 2013); *see also Shover v. Chestnut*, No. 7:18-cv-00202, 2018 WL 6625079, at *4 (W.D. Va. Dec. 18, 2018) ("[I]nmates need not appeal favorable decisions to properly exhaust administrative remedies under the PLRA."). This is consistent with MCCF's grievance procedure that specifies that the appeal process is only if the inmate "choose[s] to disagree with the action." ECF No. 57-1 at 3. "Indeed, it would be 'counterintuitive to require inmates who win during the grievance process to appeal their victories' based on a projection of 'prison official's hypothetical non-implementation of a favorable' decision." *Shover*, 2018 WL 6625079, at *4 (quoting *Abney v. McGinnis*, 380 F.3d 663, 668 (2d Cir. 2004). Moreover, "[i]f a prisoner had to grieve non-compliance with favorable decisions under the PLRA, prison officials could keep prisoners out of court indefinitely by saying 'yes' to their grievances and 'no' in practice." *Sulton v. Wright*, 265 F. Supp. 2d 292, 298–99 (S.D.N.Y. 2003).[21]

Thus, the Court denies Defendants' request for summary judgment on the issue of exhaustion as it relates to Plaintiff's § 1983 claim against Defendants White and Sturgess.

---

[21] The Court also notes that MCCF regularly failed to follow its own grievance procedures. For example, MCCF failed to respond to Plaintiff's initial grievances regarding inadequate medical care for almost a month, despite the five-day time limit outlined in MCCF's grievance procedure, ECF No. 57-1 ("If your grievance made it to step two, the appropriate area or personnel it was referred to will follow the same steps above in attempting to resolve your grievance, with the exception that they will have five (5) working days from receipt of the grievance to answer the grievance."). *See, e.g.*, ECF No. 55-8 (showing that Plaintiff filed a grievance on September 12, 2017, the grievance was forwarded under Step 1 of the grievance process to Medical on the same day, but Plaintiff did not receive a response under Step 2 of the grievance process until October 11, 2017). Additionally, despite the five-step process outlined in MCCF's grievance procedure, Plaintiff's March 19, 2018 grievance regarding inadequate medical care was addressed through a meeting with MCCF leadership rather than through the formal grievance process. *See* ECF No. 55-21; ECF No. 56-1 ¶ 8.

    **4. Counts X and XI: Negligent Retention and Supervision Claim and § 1983 Claim for Supervisor Liability for Excessive Force and Unreasonable Search Against Defendants Malagari, Green, and Gilliam**

Defendants argue that Plaintiff failed to exhaust his administrative remedies with respect to Counts X and XI because he never filed a grievance against Defendants Malagari, Green, or Gilliam. ECF No. 55-1 at 23. However, as discussed above, PLRA does not require plaintiffs to specifically name defendants in grievances. *Jones*, 549 U.S. at 218–19. Thus, to determine whether Plaintiff has appropriately exhausted his administrative remedies with regard to his supervisory liability claims against Defendants Malagari, Green, and Gilliam, this Court is guided by the analysis of its sister court, the United States District Court for the Eastern District of North Carolina ("North Carolina District Court"), in an analogous case, *Gioglio v. Faulkner*, No. 5:14-CT-3139-FL, 2016 WL 4257344, at *4 (E.D.N.C. Aug. 11, 2016).

In *Gioglio*, the plaintiff brought a supervisory liability claim against one of the defendants, Mobley, relating to a use of force incident on January 10, 2014. *Id.* The plaintiff had filed a grievance regarding the January 10 incident, but had not made any specific allegations against Mobley in the grievance. *Id.* Mobley argued that this was fatal to the plaintiff's claim because he had failed to exhaust his administrative remedies with regard to the supervisory liability claim. *Id.* The North Carolina District Court, however, denied Mobley's motion for summary judgment as to exhaustion for the supervisory liability claim, finding it sufficient that the plaintiff had filed a grievance reporting the use of force incident and Mobley had signed that grievance. *Id.*

The facts in the instant case are similar to those in *Gioglio*. The two claims against Defendants Malagari, Green, and Gilliam relate to Defendants Watkins' attack and the events of September 27–28, 2017. Defendants admit that Plaintiff filed one or more grievances regarding

the attack and do not raise an exhaustion argument with respect to Plaintiff's claims against Defendant Watkins relating to the same events. *See* ECF No. 55-1 at 23. Moreover, Plaintiff stated in his declaration that at least one of his grievances regarding the attack was returned to him as non-grievable, ending the administrative process. ECF No. 56-1 ¶ 5; ECF No. 57-1 at 3 ("If a Supervisor or staff member indicates the complaint is non-grievable at any stage, whether [the inmate] agree[s] or disagree[s], the grievance ends at that point." (emphasis omitted)). Finally, Defendant met with Defendants Malagari, Green, and Gilliam in March and April of 2018 to discuss the unaddressed grievances relating to the September 2017 attack, ECF No. 53 ¶¶ 80–81; ECF No. 56-1 ¶ 8—which is analogous to the defendant in *Gioglio* signing the grievance, *see* 2016 WL 4257344, at *4. Thus, relying on the persuasive authority of *Gioglio*, this Court denies Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment as to Defendants' exhaustion argument for Counts X and XI.

### iii. Defendants' Remaining Arguments that the Court Should Dismiss the Claims Against Defendant Watkins

In addition to the arguments discussed above, *see supra* §§ III.B.i, III.B.ii.b.1, Defendants raise two categories of arguments regarding why the Court should dismiss the claims against Defendants Watkins: (1) Defendant Watkins is not a named defendant, ECF No. 55-1 at 10–11 n.1, 12, 24; and (2) Plaintiff failed to state a claim against Defendant Watkins: (a) for intentional infliction of emotional distress in Count IV, and (b) for retaliation in violation of the First Amendment of the United State Constitution in Count VII, *id.* at 25–26. The Court will address each of these arguments separately below.

### a. Defendant Watkins as a Named Defendant

Defendants assert several times in their Motion to Dismiss that Defendant Watkins is not a named defendant and imply the Court should dismiss the claims against him for that reason.

*See* ECF No. 55 at 1–2 n.1 ("Eric Watkins is not named as a defendant in the Amended

Complaint, but Plaintiff has attempted to assert several claims against him in the body of the

Amended Complaint"); ECF No. 55-1 at 10–11 n.1, 12, 23–24. This argument has no merit.

> Under the United States District Court for the District of Maryland Local Rules:
>
> The case caption on all court documents shall contain only a short title, consisting of the names of the first plaintiff and the first defendant only, and the civil action number. This Rule shall not apply to the original complaint (which shall contain the names and addresses of all parties and the county of residence of any Maryland party) or any pleading seeking to add a new party (which shall contain the short caption and the name and address of the parties sought to be added and the county of residence of any Maryland party sought to be added).

Loc. R. 102.2(a) (D. Md. 2018).

Defendant Watkins was the sole defendant in GJH-18-1952 and thus was included in the

case caption. GJH-18-1952, ECF No. 1. On August 6, 2019, the Court consolidated GJH-18-

1952, and other related cases, with GJH-18-1949. ECF No. 33.[22]   Because Defendant Watkins

was one of the original Defendants in the instant consolidated case and was not added by the

Amended Complaint, Plaintiff did not include his name in the caption of the Amended

Complaint. ECF No. 53 at 1. Instead, Defendant Watkins was one of the Defendants

encompassed by the short caption: "ROBERT GREEN et al." *See id.* at 1. Plaintiff's inclusion of

Defendant Watkins in the section of the Amended Complaint titled "THE PARTIES" further

clarifies Plaintiff's intention to include Defendant Watkins as a named defendant. *See id.* ¶ 9.

Thus, the Amended Complaint's caption complies with Rule 102.2(a) and sufficiently includes

Defendant Watkins as a named defendant.

Because Count I, Plaintiff's 42 U.S.C. § 1983 claim for excessive force in violation of the

Fourteenth Amendment, is only against Defendant Watkins and Defendants' only argument

---

[22] The Court notes Defendant Watkins was included in the caption of the Court's Order consolidating the cases.

regarding Count I is that Defendant Watkins is not a named defendant, Defendants' Motion to

Dismiss as it relates to Count I is denied. Additionally, the Court denies Defendants' Motion to

Dismiss as it relates to Count II, Plaintiff's assault claim against Defendant Watkins, and Count

III, Plaintiff's battery claim against Defendant Watkins, because neither of Defendants'

arguments concerning those claims—(1) lack of notice under the LGTCA, *see supra* § III.B.i,

and (2) not a named defendant—is persuasive.

### b.    Failure to State a Claim

#### 1.    Failure to State a Claim for Intentional Infliction of Emotional Distress

Defendants argue that, even accepting Plaintiff's allegations in the Amended Complaint

as true, Plaintiff has failed to state a claim for intentional infliction of emotional distress

("IIED") because "there is no evidence to make an inference that Officer Watkins acted with

personal animus to inflict severe emotional distress on Plaintiff or that Plaintiff suffered a

debilitating psychiatric condition." ECF No. 55-1 at 25.[23] This argument is unpersuasive.

To state a common law claim for IIED, Plaintiff must allege that: (1) the defendant's

conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a

causal connection between the wrongful conduct and the emotional distress; and (4) that the

emotional distress was severe. *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977). In Maryland, an

IIED claim is "rarely viable," *Borchers v. Hrychuk*, 727 A.2d, 388, 392 (Md. Ct. Spec. App.

1999), and courts have imposed "liability sparingly and . . . limited the tort to situations where

the 'wounds are truly severe and incapable of healing themselves.'" *Lee v. Queen Anne's Cty.*

---

[23] At the pleading stage of a civil action, evidence of the elements of a cause of action is not required. *Discovery Commc'ns, LLC v. Computer Scis. Corp.*, No. DKC 12-2894, 2013 WL 3448076, at *4 (D. Md. July 8, 2013) ("[a]t the pleading stage, a plaintiff's burden is merely to allege facts, not to allege evidence" (brackets in original) (quoting *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 249 F. Supp. 2d 703, 710 (D. Md. 2003))).

*Office of Sheriff*, No. CIV.A. RDB-13-672, 2014 WL 476233, at *16 (D. Md. Feb. 5, 2014)

(citing *McDaniel v. Maryland*, No. CIV.A RDB-10-00189, 2010 WL 3260007, at *10 (D. Md.

Aug. 18, 2010)). Accordingly, an IIED claim is subject to a heightened pleading standard, and

each element of the claim must be "pled with specificity." *Washington v. Maynard*, No. CV

GLR-13-3767, 2016 WL 865359, at *10 (D. Md. Mar. 7, 2016) (citing *Bagwell v. Peninsula

Reg'l Med. Ctr.*, 665 A.2d 297, 319 (Md. Ct. Spec. App. 1995); and *Foor v. Juv. Servs. Admin.*,

552 A.2d 947, 959 (Md. Ct. Spec. App. 1989)). Defendant contends that Plaintiff has

inadequately pleaded the first and fourth elements of an IIED claim. *See* ECF No. 55-1 at 25.

To adequately plead the first element of an IIED claim, a plaintiff must allege that the

defendant either "desired to inflict severe emotional distress, knew that such distress was certain

or substantially certain to result from his conduct, or acted recklessly in deliberate disregard of a

high degree of probability that emotional distress would follow." *Brengle v. Greenbelt Homes,

Inc.*, 804 F. Supp. 447, 452 (D. Md. 2011) (citing *Interphase Garment Sols., LLC v. Fox

Television Stations, Inc.*, 566 F. supp. 2d 460, 466 (D. Md. 2008)).

With respect to the fourth element, the plaintiff must show that he suffered "a severely

disabling emotional response to the defendant's conduct, and that the distress was so severe that

no reasonable man could be expected to endure it." *Solis v. Prince George's Cty.*, 153 F. Supp.

2d 793, 804 (D. Md. 2001) (quoting *Thacker v. City of Hyattsville*, 762 A.2d 172, 197 (Md. Ct.

Spec. App. 2000)). "We measure such severity by the intensity of the response as well as its

duration." *Caldor, Inc. v. Bowden*, 625 A.2d 959, 964 (Md. 1993). To prevail, the plaintiff must

show the "truly devastating effect of the conduct [he was] subjected to." *Kashaka v. Baltimore

Cty., Maryland*, 450 F. Supp. 2d 610, 620 (D. Md. 2006) (citing *Rich v. United States*, 158 F.

Supp. 2d 619, 630 (D. Md. 2001)). However, to be severe, "emotional distress need not produce

total emotional or physical disablement[,]" rather "severity must be measured in light of the outrageousness of the conduct[.]" *Figueiredo-Torres v. Nickel*, 584 A.2d 69, 76 (Md. 1991) (citation omitted).

"In appropriate cases, 'severe' emotional distress may be inferred from the extreme and outrageous nature of the defendant's conduct alone." *Reagan v. Rider*, 521 A.2d 1246, 1251 (Md. Ct. Spec. App. 1987). In assessing outrageousness, "courts should consider multiple factors, including the context in which the conduct occurred, the personality of the plaintiff and [his] susceptibility to emotional distress, and the relationship between the defendant and plaintiff." *Brengle*, 804 F. Supp. 2d at 453. In particular, "the extreme and outrageous character of the defendant's conduct may arise from his abuse of a position, or relation with another person, which gives him actual or apparent authority over him, or power to affect his interests." *Harris*, 380 A.2d at 616.

Here, Plaintiff has pleaded sufficient factual matter as to both the first and fourth elements. Taking the allegations in the Amended Complaint as true, Plaintiff has alleged that Defendant Watkins intentionally and with actual malice attacked Plaintiff—who was suffering a severe ocular migraine at the time—by slamming his head face-first into the shower wall multiple times while Plaintiff's hands were handcuffed behind his back and then by proceeding to sexually molest Plaintiff by grabbing Plaintiff's genitals while he was screaming in pain and bleeding from his head. ECF No. 53 ¶¶ 42, 44, 48–55, 115. This attack took place in an area of the prison without cameras, a fact of which Defendant Watkins was likely aware. *Id.* ¶ 48. The incident resulted in a trip to the emergency room to treat Plaintiff's injuries, including a laceration over Plaintiff's right eye, a closed head injury, and a neck contusion. *Id.* ¶ 60. Plaintiff has also alleged that, after the attack, he filed multiple sick slips seeking to see a psychiatrist but

did not receive a mental health referral for a month. *Id.* ¶¶ 62, 64. Additionally, Plaintiff has alleged that when he saw Defendant Watkins for the first time after the attack, he felt a rush of fear so severe that it caused him to vomit. *Id.* ¶ 63. When Plaintiff finally received a referral for mental health services, the nurse filling out the referral noted on the form that Plaintiff's symptoms "sound[] like PTSD." *Id.* ¶ 64. After seeing a therapist regarding the attack, Plaintiff was not permitted to return to the therapist while at MCCF, despite his request to do so. *Id.* Finally, Plaintiff has alleged that "he continues to receive ongoing therapy" as a result of the severe emotional distress Defendant Watkins' attack caused. *Id.* ¶ 117.

Drawing all reasonable inferences in favor of Plaintiff, Defendant Watkins knew that emotional distress would result from his attack or acted in reckless disregard of the high probability that it would occur, and such conduct went "beyond all possible bounds of decency, and . . . [was] atrocious, and utterly intolerable in a civilized community." *Harris v. Jones*, 380 A.2d at 614 (citation omitted). Bolstering this conclusion is the fact that Defendant Watkins' attack occurred while Plaintiff was in the custody and control of Defendant Watkins and his fellow correctional officers and in a room without cameras, inhibiting any investigation by MCCF into Plaintiff's grievances regarding the attack. *Cf. Gray v. Kern*, 124 F. Supp. 3d 600, 616 (D. Md. 2015) (noting that "where the defendant is in a peculiar position to harass the plaintiff, and cause emotional distress, his conduct will be carefully scrutinized").

Moreover, Plaintiff has "plead[ed] specific facts regarding the nature, intensity, and duration of the alleged emotional distress," *See Hovatter v. Widdowson*, No. CCB-03-2904, 2004 WL 2075467, at *9 (D. Md. Sept. 15, 2004). Plaintiff described in his Amended Complaint a physical manifestation of his distress, an observation by a medical professional that Plaintiff was exhibiting symptoms of PTSD, and the continuing treatment Plaintiff receives for his emotional

distress. Further, Plaintiff's allegations regarding the circumstances of the attack strengthen his allegations regarding the resulting emotional distress. *See Reagan*, 521 A.2d at 1251 ("The very nature of the conduct involved can provide a guarantee that the claim for emotional distress is genuine and serious. When the acts of the defendant are so horrible, so atrocious and so barbaric that no civilized person could be expected to endure them without suffering mental distress, the jury may find as a matter of fact that 'severe' emotional distress resulted."). At the time of the attack, Defendant Watkins had assumed a position of authority over Plaintiff and was responsible for Plaintiff's health and safety. Meanwhile, Plaintiff was in a vulnerable position—shackled with his hands behind his back, suffering from a severe migraine, and held in a room without cameras. Defendant Watkins' alleged abuse of power and exploitation of Plaintiff's vulnerabilities, and the resulting degradation of Plaintiff caused by the attack, was outrageous and extreme, reinforcing the severity of Plaintiff's resulting emotional distress. *See Figueiredo-Torres*, 584 A.2d at 76.

Thus, Plaintiff has sufficiently stated an IIED claim upon which relief can be granted. Because the Court rejects all three of Defendants' arguments that the Court should dismiss Plaintiff's IIED claim—(1) inadequate notice under LGTCA, *see supra* § III.B.i, (2) not a named defendant, *see supra* § III.B.iii.a, and (3) failure to state a claim—Defendants' Motion to Dismiss is denied as it relates to Count IV of Plaintiff's Amended Complaint.

### 2. Failure to State a Claim for Retaliation Pursuant to 42 U.S.C. § 1983

Defendants argue that "Plaintiff's claim of retaliation [against Defendant Watkins] . . . fails for failure to state a claim." ECF No. 55-1 at 25. The Court disagrees.

"To state a colorable First Amendment retaliation claim, a plaintiff 'must allege that (1) []he engaged in protected First Amendment activity, (2) the defendant[] took some action that

adversely affected [his] First Amendment rights, and (3) there was causal relationship between [his] protected activity and the defendant['s] conduct." *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020). "[F]or purposes of a First Amendment retaliation claim under [Section] 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (alterations in original) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)). However, "[t]he prisoner need not succumb entirely or even partially to the threat; it is sufficient that the retaliation was intended to limit the prisoner's right of access to the courts and was reasonably calculated to have that affect." *Thompson v. Clarke*, 633 F. App'x 207, 208 (4th Cir. 2016)

Here, Plaintiff has pleaded that "[i]n the wake of the attack by Defendant Watkins . . . , Plaintiff filed numerous grievances detailing Defendant Watkin's conduct and sought to press criminal charges" and that he ultimately filed charges on December 7, 2017. ECF No. 53 ¶¶ 131, 133. Additionally, Plaintiff pleaded that Defendant Watkins knew of Plaintiff's attempts to seek redress for the September 2017 attack and that, on the same day Plaintiff ultimately filed charges, Defendant Watkins "threatened to take Plaintiff back to the showers in the segregation unit where the attack occurred." *Id.* ¶ 132–33.

Drawing all reasonable inferences in Plaintiff's favor, Plaintiff has sufficiently pleaded all three elements of a First Amendment retaliation claim. As to the first element, filing grievances and pursuing judicial remedies are protected First Amendment activities. *See Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 542 (4th Cir. 2017) (holding that "although inmates do not have a constitutional entitlement to and/or due process interest in accessing a grievance procedure, they have a First Amendment right to be free from retaliation when they do file");

*Thompson*, 633 F. App'x at 208 ("Retaliation against an inmate for exercise of his First Amendment right of access to the courts can support a claim for relief under § 1983." (citing *Hudspeth v. Figgins*, 584 F.2d 1345, 1348 (4th Cir. 1978))). As to the second element, despite Defendants' arguments to the contrary, "[a] threat of physical harm to a prisoner if he persists in pursuit of his judicial [and administrative] relief is as impermissible as a more direct means of restricting" Plaintiff's First Amendment rights. *Hudspeth*, 584 F.2d at 1348.[24] Moreover, the deterrent effect of Defendant Watkins' threat was exacerbated by Defendant Watkins' prior violent interactions with Plaintiff. ECF No. 53 ¶¶ 46–55, 88.  Finally, as to the third element, Plaintiff has sufficiently alleged that Defendant Watkins was aware of Plaintiff's First Amendment activity, and it is reasonable for the Court to infer that Defendant Watkins' threat to take Plaintiff back to the location of the attack was intended to have a chilling effect on the exercise of Plaintiff's First Amendment rights—especially considering the timing of the threat.

Thus, Plaintiff has sufficiently pleaded a First Amendment retaliation claim, pursuant to 42 U.S.C. § 1983, upon which relief can be granted. Moreover, because Defendants' other arguments that Plaintiff's First Amendment claim against Defendant Watkins (Count VII) should be dismissed—(1) failure to exhaust, *see supra* § III.B.ii.b.1, and (2) not a named defendant, *see supra* § III.B.iii.a—fail, the Court denies Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment as it relates to Count VII.

---

[24] Defendants argue that "Plaintiff's allegation of retaliation here fails because the Amended Complaint is devoid of any allegation that the threat led to any physical act or any physical retaliation." ECF No. 55-1 at 16. The only binding case law Defendants cite for this proposition, however, was a case the Fourth Circuit decided in the context of an Eighth Amendment claim, not a First Amendment retaliation claim. *See Henslee v. Lewis*, 153 F. App'x 178, 179 (4th Cir. 2005). Thus, this Court is bound by *Hudspeth*, which is a Fourth Circuit case directly on point. *See* 584 F.2d at 1348.

iv.     **Defendants' Remaining Argument that the Court Should Dismiss the Claims Against Defendants Taylor, Brown, and Beam – Failure to State a Claim**

Defendants argue that Plaintiff has failed to state a claim for unreasonable search in violation of the Fourth Amendment against Defendants Taylor, Brown, and Beam because Plaintiff does not allege that Defendants Taylor, Brown, and Beam touched Plaintiff in a sexually suggestive manner nor does Plaintiff allege that they directed or encouraged Officer Watkins to touch Plaintiff's genitals. ECF No. 55-1 at 24. Plaintiff responds that "a group of officers collectively engaged in an unlawful search cannot avoid liability because they were not the most active participants." ECF No. 56 at 24. Plaintiff is correct.

Pretrial detainees, like Plaintiff, "retain some Fourth Amendment rights upon commitment to a corrections facility," although those rights may be more limited than the rights of persons who are not incarcerated. *Bell v. Wolfish*, 441 U.S. 520, 558 (1979). Accordingly, pretrial detainees are still protected by the Fourth Amendment from unreasonable searches. *Id.* However, "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Id.* at 559. Rather, "[i]n each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it was conducted." *Id.*

In the instant case, Plaintiff has sufficiently pleaded the occurrence of an unreasonable search. Plaintiff has alleged there was not a legitimate need for a strip search because Defendants "had no reasonable basis to believe that Plaintiff had contraband[,]" and there is not "any general policy requiring an inmate to be strip searched prior to entering the segregation unit." ECF No. 53 ¶ 59. Plaintiff's allegation that Defendants only removed Plaintiff's jumpsuit halfway, did not pat Plaintiff down, and did not make him remove his remaining clothing, further supports

Plaintiff's allegations that there was no reasonable basis for the search. *Id.* ¶ 54. Plaintiff also alleges that the strip search involved a correctional officer grabbing Plaintiff's genitals through his boxers despite the Montgomery County Department of Correction and Rehabilitation policy permitting "only a visual inspection of an inmate undergoing a strip search" and prohibiting "physical touching of an inmate's genitals." *Id.* ¶¶ 54, 59. Moreover, the strip search took place while Plaintiff was handcuffed with his hands behind his back and after a correctional officer had slammed his head into the shower wall. *Id.* ¶ 51, 54. Finally, Plaintiff alleges the strip search took place in an area of the prison with no cameras, disregarding MCCF policy requiring strip searches to take place in central processing. *Id.* ¶¶ 48, 59.

However, Defendants still maintain Plaintiff has failed to state a claim against Defendants Taylor, Beam, and Brown because Defendant Watkins was the party to allegedly touch Plaintiff in a sexually inappropriate manner. While it may be true that Defendants Taylor, Beam, and Brown are not the ones who allegedly grabbed Plaintiff's genitals, drawing all reasonable inferences in Plaintiff's favor, Plaintiff has still adequately pleaded their participation in the search. Defendant Brown, along with Defendant Watkins, told Plaintiff he needed to undergo a strip search to enter the segregation unit. *Id.* ¶ 48. Defendants Taylor, Beam, and Brown were all in the shower area when the unreasonable search took place. *Id.* ¶ 55. Defendants Taylor, Beam, and Brown held the Plaintiff upright so that Defendant Watkins could conduct the improper search and dressed Plaintiff after the search had concluded. *Id.* ¶ 54. The Court finds these allegations sufficient to survive a Fed. R. Civ. P. 12(b)(6) motion.

Because the Court finds all three of Defendants' arguments that the Court should dismiss Plaintiff's § 1983 unreasonable search claim—(1) failure to exhaust as to claim against Defendants Taylor, Beam, and Brown, *see supra* § III.B.ii.b.2; (2) Defendant Watkins' is not a

named defendant, *see supra* § III.B.iii.a; and (3) failure to state a claim against Defendants

Taylor, Beam, and Brown—unpersuasive, the Court denies Defendants' Motion to Dismiss, or in

the Alternative, for Summary Judgment as to Count VI.

> **v.    Defendants' Remaining Arguments that the Court should Dismiss Plaintiff's Claim Against Defendants White and Sturgess**

In addition to Defendants' failure to exhaust argument, which the Court disposed of

above, *see supra* § III.B.ii.b.3, Defendants argue that the Court should dismiss Plaintiff's § 1983

claim for supervisory liability for inadequate medical care against Defendants White and

Sturgess (Count IX) for two additional reasons: (1) Plaintiff cannot establish a § 1983 claim

against Defendants White and Sturgess, ECF No. 55-1 at 26–33; and (2) Defendants White and

Sturgess are entitled to qualified immunity, *id.* at 34–35. Because Plaintiff cannot establish a

§ 1983 claim against these Defendants, the Court will not address the issue of qualified immunity

as to them.

Defendants argue Plaintiff has both failed to state a § 1983 claim in his Amended

Complaint under the Fed. R. Civ. P. 12(b)(6) standard and failed to prove a § 1983 claim under

the summary judgment standard because (1) Plaintiff has not properly alleged or provided facts

to support the foundational requirements of supervisory liability, including knowledge of

conduct by subordinates placing Plaintiff at risk of constitutional injury and deliberate

indifference to that conduct and the risk of injury; and (2) Plaintiff has not established the

medical need at issue is serious or that substantial harm resulted from the Nurse Defendants'

provision of inadequate medical care. ECF No. 55-1 at 26–33. Because the Court finds Plaintiff

has failed to adequately allege, pursuant to Fed. R. Civ. P. 12(b)(6), that Defendants White and

Sturgess were deliberately indifferent to Nurse Defendants' provision of inadequate medical

care, the Court will not address Defendants' claim that Plaintiff has not established a serious

medical need nor Defendants' arguments under the summary judgment standard.

A plaintiff must allege three elements in order to establish supervisory liability under

§ 1983:

> (1) that the supervisor had actual or constructive knowledge that his subordinate
> was engaged in conduct that posed a pervasive and unreasonable risk of
> constitutional injury to citizens like the plaintiff; (2) that the supervisor's response
> to that knowledge was so inadequate as to show deliberate indifference to or tacit
> authorization of the alleged offensive practices; and (3) that there was an
> affirmative causal link between the supervisor's inaction and the particular
> constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 798–99 (4th Cir. 1994) (internal citations and quotation marks

omitted). In the instant case, Defendants challenge the sufficiency of Plaintiff's Amended

Complaint with respect to the first and second elements—*i.e.*, knowledge and deliberate

indifference.

### a.        Actual or Constructive Knowledge

"To satisfy the requirements of the first element, a plaintiff must show the following: (1)

the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct

poses a pervasive and unreasonable risk of constitutional injury to the plaintiff." *Shaw*, 13 F.3d at

799 (internal citation omitted). Plaintiff has sufficiently pleaded each of these items such that the

Amended Complaint contains factual allegations sufficient to survive a motion to dismiss as to

the first element.

As to the first item, Plaintiff pleaded that Defendants White and Sturgess had knowledge

of their subordinates'—the Nurse Defendants'—conduct. Plaintiff alleged that Defendants White

and Sturgess "had actual knowledge of the practice of Nurse Defendants' delay or otherwise

improper administration of Plaintiff's migraine medication" through numerous administrative

grievance forms filed by Plaintiff as well as meetings between Defendants and Plaintiff held to

address the alleged failure of care. ECF No. 53 ¶¶ 145, 147; *see also id.* ¶ 41 ("Between approximately September 12, 2017 and April 7, 2018, Plaintiff submitted upwards of ten grievances with MCCF through which he informed MCCF personnel, including Defendant Sturgess and Defendant White, that nurses were not providing proper treatment. Defendant Sturgess and Defendant White signed a number of these grievances, confirming receipt and review."); *id.* ¶ 61 ("On October 11, 2017, . . . Defendant White met with Plaintiff to discuss the ongoing failures of the Nurse Defendants to follow the instructions of Plaintiff's physician and properly treat his condition."); *id.* ¶ 80 ("On or around March 6, 2018, Plaintiff met with Defendants Green, Gilliam, White, and Malagari . . . [and] discussed a number of unaddressed grievances including . . . his delayed medical treatment."), *id.* ¶ 81 ("On April 2, 2018, Plaintiff met with Defendants Malagari, Gilliam, White, and Sturgess . . . [and] discussed not only the poor medical treatment he had received at the prison and the many failures to respond to his grievances . . . .").

As to the second item, Plaintiff's Amended Complaint sufficiently describes Nurse Defendants'—*i.e.*, the subordinates'—alleged conduct. Specifically, Plaintiff alleged that Nurse Defendants "repeatedly failed to take reasonable measures to ensure that Plaintiff received his medication as prescribed and repeatedly delayed administration of this medication[,]" *id.* ¶ 140, despite their knowledge that "Plaintiff had a serious medical need to take migraine medication immediately after the onset of symptoms, as prescribed and instructed by his physician, in order to prevent severe, unnecessary, and needless pain due to exacerbated symptoms[,]" *id.* ¶ 139.

Finally, as to the third item, Plaintiff adequately alleged Nurse Defendants' conduct "pose[d] a pervasive and unreasonable risk of constitutional injury to the plaintiff[.]" *See id.* ¶¶ 146, 148; *Shaw*, 13 F.3d at 799. Pleading a pervasive and unreasonable risk of harm requires

factual allegations that "the conduct [was] widespread, or at least ha[d] been used on several different occasions and that the conduct engaged in by the subordinates pose[d] an unreasonable risk of harm of constitutional injury." *Shaw*, 13 F.3d at 799. Consistent with this requirement, Plaintiff pleaded that Nurse Defendants "*repeatedly* failed to take reasonable measures to ensure that Plaintiff received his medication as prescribed and *repeatedly* delayed administration of this medication." ECF No. 53 ¶ 140 (emphasis added); *see also id.* ¶ 40 ("On multiple occasions between May 2017 and September 2017, Plaintiff sought treatment at the medical unit at the onset of his migraine symptoms, but Nurse Defendants failed to timely administer Imitrex to Plaintiff, either delaying his dosage for hours after his migraine symptoms had become severe or denying him access to his medication outright.").

Plaintiff also pleaded that Nurse Defendants' failure to timely administer Plaintiff's migraine medication was the result of deliberate indifference to Plaintiff's serious and apparent medical need in violation of the Fourteenth Amendment.[25] *See* ECF No. 153 ¶ 149; *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (outlining the requirements for establishing a claim of deliberate indifference to medical need). As to deliberate indifference, "[f]ailure to provide the level of care that a treating physician himself believes is necessary could be found conduct which 'surpass[es] negligence and constitute[s] deliberate indifference.'" *Militier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990) (quoting *Ancata v. Prison Health Serv., Inc.*, 769 F2d 700, 704 (11th Cir. 1985)). Plaintiff pleaded that his "prescribing physician specifically instructed that Plaintiff

---

[25] When the Plaintiff is a pretrial detainee rather than a convicted prisoner, "then the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, mandates the provision of medical care to *detainees* who require it." *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) (internal quotation marks and citations omitted) (emphasis in original). However, the standard under the Eighth and Fourteenth Amendments is the same—"that is, whether a government official has been deliberately indifferent to any [of his] serious medical needs." *Id.* (internal quotation marks omitted) (alteration in original); *see also Barnes v. Wilson*, 110 F. Supp. 3d 624, 629 (D. Md. 2015) ("The constitutional protections afforded a pre-trial detainee as provided by the Fourteenth Amendment are co-extensive with those provided by the Eighth Amendment.").

should be administered Imitrex at the onset of his migraine episodes in order to limit further accompanying pain and debilitating symptoms." ECF No. 53 ¶ 35. The Nurse Defendants were aware, or should have been aware, of these instructions, *id.* ¶¶ 38–39, but Nurse Defendants failed to timely administer Imitrex to Plaintiff on multiple occasions, *id.* ¶ 40. Thus, the Court finds Plaintiff's allegations sufficient to survive a motion to dismiss as to the issue of the Nurse Defendants' deliberate indifference.

Finally, as to the existence of a serious medical need, an inmate pleads that migraine headaches rise to the level of a serious medical need that a lay person would recognize if the inmate alleges the migraines are disabling. *Royster v. Corizon*, No. 3-CV-13-1449, 2014 WL 1655088, at *5 (M.D. Pa. Apr. 23, 2014) ("[Plaintiff] alleges the necessary inference that the . . . defendants possessed the required culpable state of mind in light of both the extreme severity of his condition, the obviousness of his migraine condition, and the self-evident need to treat as directed by his physicians, [Plaintiff] has asserted a valid Eighth Amendment claim against them for delaying the delivery of his prescribed migraine medication."); *see Clas v. Torres*, 549 F. App'x 922, 924 (11th Cir. 2013) ("accepting [the plaintiff]'s allegations of intense migraine-like symptoms as demonstrative of a serious medical need"); *Miller v. Beard*, 699 F. Supp. 2d 697, 712 (E.D. Pa. 2010) ("An inmate might be able to demonstrate that migraine headaches rise to the level of a serious medical need . . . but only if the inmate can provide evidence that migraines are disabling."); *May v. Jones*, No. 1:07-CV-1787, 2009 WL 4793031, at *4 (M.D. Pa. Dec. 7, 2009) (noting that the inmate's migraines led to "excruciating" pain that "caus[ed] the plaintiff to vomit . . . [and] was so bad the plaintiff couldn't eat or sleep for two days" (quotation marks omitted)). In his Amended Complaint, Plaintiff pleaded that as a result of the Nurse Defendants continued provision of inadequate medical treatment of Plaintiff's migraines, "Plaintiff

continued to suffer prolonged and severe health issues, which included a three-week period where Plaintiff was totally debilitated, consistently vomited blood and a black substances, was unable to keep down food and suffered from gastro-intestinal complaints." ECF No. 53 ¶ 69; *see also id.* ¶ 32 ("The symptoms of these migraines are debilitating for Plaintiff, causing him severe head and eye pain, dizziness, vomiting, and vision difficulties. Plaintiff is sometimes confined to his bed for days at a time when experiencing a migraine episode."); *id.* ¶ 34 ("Because the drug works as a preventative measure, it is effective only when taken at the first sign of a migraine."). Plaintiff has adequately pleaded serious medical need. *See Mahon v. Kilgore*, No. 7:17-cv-00406, 2018 WL 4655756, at *9 (W.D. Va. Sept. 27, 2018). ("Conditions or delays that cause or perpetuate 'excruciating' pain also may be a serious medical need.")

Therefore, because Plaintiff has sufficiently alleged (1) Defendants White and Sturgess's knowledge of (2) Nurse Defendants' repeated failure to timely administer Plaintiff's migraine medication (3) where Nurse Defendants' failure violated Plaintiff's Fourteenth Amendment rights, Plaintiff has pleaded the first element of a supervisory liability claim against Defendants White and Sturgess sufficient to survive a motion to dismiss. *See Shaw*, 13 F.3d at 799.

### b.    Deliberate Indifference or Tacit Authorization

In order for Plaintiff's supervisory liability claim against Defendants White and Sturgess to survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), Plaintiff must adequately allege that Defendants White and Sturgess's response to their knowledge of Nurse Defendants' failure to provide Plaintiff with adequate medical care "was so inadequate as to show deliberate indifference to or tacit authorization of Nurse Defendants' misconduct. *See Shaw*, 13 F.3d at 799. Plaintiff has not done so here.

"A plaintiff may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses." *Shaw*, 13 F.3d at 799; *see also Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (same). However, Plaintiff's Amended Complaint has done the opposite. While Plaintiff alleges he submitted numerous grievances between May 2017 and September 2017 regarding the Nurse Defendants' failure to administer Plaintiff's migraine medication in a timely manner, ECF No. 53 ¶ 40, Plaintiff also describes an October 11, 2017 meeting responding to these grievances where Defendant White agreed to stock additional Imitrex and to permit Plaintiff to keep Imitrex with him on a trial basis, *id.* ¶ 67. Defendant White also agreed at this meeting to instruct Nurse Defendants on how to properly administer Imitrex to Plaintiff. *Id.* Plaintiff does not allege that Defendant White failed to take these actions. Instead, Plaintiff alleges that despite Defendant White's promises, the Nurse Defendants "continued to deny Plaintiff proper medical treatment," which resulted in additional grievances. *Id.* ¶ 68. The same pattern played out with respect to those post-October 2017 grievances—Defendants White and Sturgess met with Plaintiff regarding those grievances, first in March 2018 and again in April 2018. *Id.* ¶¶ 80, 81. Plaintiff does not allege that he submitted any additional grievances after April 2018. *Id.* ¶ 41. While Defendants White and Sturgess's actions responding to Nurse Defendants' alleged misconduct may not have been effective in addressing Plaintiff's claims of inadequate medical care, the Court does not find Defendant White and Sturgess's responses, as described by Plaintiff in the Amended Complaint, showed "deliberate indifference to or tacit authorization of" Nurse Defendants' misconduct. "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it. As such, a supervisory official who responds reasonably to a known risk is not deliberately indifferent even if the harm is not averted." *Mikkelson v. DeWitt*, 141 F. App'x 88, 91–92 (4th

Cir. 2005) (internal quotation marks and citations omitted). Thus, Plaintiff has not sufficiently

alleged deliberate indifference and the Court dismisses his § 1983 supervisory liability for denial

of adequate medical claim against Defendants White and Sturgess under Fed. R. Civ. P. 12(b)(6)

for failure to state a claim. Defendants' Motion to Dismiss is granted as to Count IX.

### vi.     Defendants' Remaining Arguments that the Court Should Dismiss Plaintiff's Claims Against Defendants Malagari, Green, and Gilliam

Defendants raise two arguments in favor of dismissing Plaintiff's claims against

Defendants Malagari, Green, and Gilliam: (1) qualified immunity; and (2) public official

immunity. The Court will discuss each argument below.

### a.     Qualified Immunity

Defendants argue that Defendants Malagari, Green, and Gilliam are entitled to qualified

immunity for Counts X (negligent retention and supervision) and XI (supervisory liability for

excessive force and unreasonable search under § 1983). The Court disagrees.

Qualified immunity affords a government official protection from suits for monetary

damages when the official has acted in good faith. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982). Qualified immunity is "an affirmative defense that shields government officials

performing discretionary functions from personal-capacity liability for civil damages under

§ 1983, insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." *Occupy Columbia v. Haley*, 738 F.3d

107, 118 (4th Cir. 2013) (internal quotation marks omitted); *see also Harlow*, 457 U.S. at 818.

The doctrine is intended to apply to "gray areas, where the law is unsettled or murky," rather

than situations where the government actors were "plainly incompetent or . . .  knowingly

violate[d] the law." *Occupy Columbia*, 738 F.3d at 118 (internal citations and quotation marks omitted).

The Fourth Circuit articulated the relevant test for qualified immunity in *Pritchett v. Alford*, 973 F.2d 307 (4th Cir. 1992). In ruling on a defense of qualified immunity, a court must (1) identify "the specific right allegedly violated"; (2) determine "whether at the time of the alleged violation the right was clearly established"; and (3) if so, then decide "whether a reasonable person in the officer's position would have known that doing what he did would violate that right." *Id.* at 312. The first two criteria are pure questions of law to be resolved by the court. *See id.* The third criterion, which requires an evaluation of the objective reasonableness of the conduct in question, may necessitate the resolution of disputed factual issues surrounding the conduct. *See id.* For example, "[i]n instances where there is a material dispute over what the defendant did, and under the plaintiff's version of the events the defendant would have, but under the defendant's version of events he would not have, violated clearly established law, it may be that the qualified immunity question cannot be resolved without discovery." *DiMeglio v. Haines*, 45 F.3d 790, 795 (4th Cir.1995).

Here, Defendants argue that "Plaintiff has not alleged any constitutional violation on the part of the Defendants, nor has he alleged any facts to suggest that Defendants should have known or believed that their conduct violated any constitutional right." ECF No. 55-1 at 35. Defendant also asserts that Plaintiff has failed to allege that Defendants Malagari, Green, and Gilliam's conduct was anything but objectively reasonable. *Id.* This argument is unpersuasive.

As an initial matter, qualified immunity is unavailable for Plaintiff's common law tort claim of negligent retention and supervision. *See Jenkins v. City of N.Y.*, 478 F.3d 76, 86 (2d Cir. 2007) ("Qualified immunity protects an official from liability under *federal* causes of action but

is not generally understood to protect officials from claims based on state law." (internal

quotation marks omitted)); *Samuel v. Holmes*, 138 F.3d 173, 179 (5th Cir. 1998) (holding that

qualified immunity does not apply to state law claims absent express provision in the state

statute); *Gossman v. Allen*, 950 F.2d 338, 341 (6th Cir. 1991) (denying qualified immunity where

state law claims were not used to establish any violation of federal law); *Andreu v. Sapp*, 919

F.2d 637, 640 (11th Cir. 1990) ("Qualified immunity is a defense to federal causes of action and

does not protect officials from claims based on state law."). Plaintiff raised this issue in his

Opposition, ECF No. 56 at 32, and Defendants appear to concede the point in their Reply, ECF

No. 57 at 1 ("Defendants, however, seek dismissal of Count XI not based on qualified immunity

but on the common law theory of public official immunity."). Thus, to the extent Defendants

originally argued that Count X should be dismissed as to Defendants Malagari, Green, and

Gilliam based on the federal doctrine of qualified immunity, the Court denies Defendants'

Motion to Dismiss, or in the Alternative, for Summary Judgment as to that issue.

The Court, however, must conduct a more in-depth analysis in order to determine

whether Defendants Malagari, Green, and Gilliam are protected by qualified immunity as to

Plaintiff's § 1983 supervisory liability claim in Count XI. As the Fourth Circuit instructed in

*Pritchett*, the Court first identifies the "specific right allegedly violated[.]" *Pritchett*, 973 F.2d at

312. In the instant case, Plaintiff has alleged supervisory liability against Defendants Malagari,

Green, and Gilliam for Defendant Watkins' use of excessive force in violation of Plaintiff's

Fourteenth Amendment due process rights and for an unlawful strip search by Defendants

Watkins, Taylor, Brown, and Beam in violation of Plaintiff's Fourth Amendment right to be free

from unreasonable searches and seizures. *See* ECF No. 53 at 21–22, 25, 30.

Next, the Court determines whether "at the time of the alleged violation the right was clearly established[.]" *Pritchett*, 973 F.2d at 312. Here, Plaintiff's Fourteenth Amendment and Fourth Amendment rights were clearly established as was the applicability of supervisory liability. It is uncontroversial that a correctional officer slamming a handcuffed pretrial detainee's face against a shower wall without justification is a violation of that detainee's Fourteenth Amendment due process rights. *See, e.g.*, *Mesmer v. St. Mary's Cty.*, No. DKC 10-1053, 2010 WL 4791884, at *10 (D. Md. Nov. 18, 2010) (finding that an officer was not entitled to qualified immunity on charges that he violated a pretrial detainee's due process rights by slamming him into a wall and punching him in the jaw); *Leland v. Vought*, No. 4:0-cv-20, 2008 WL 4525113, at *7 (N.D. Fla. Sept. 30, 2008) (stating that officer was not entitled to qualified immunity on claim that he allegedly punched a handcuffed prisoner in the back of the head). However, it is a closer question whether Plaintiff's Fourth Amendment right is clearly established. The Fourth Amendment clearly protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches[.]" U.S. Const. Amend. IV. It is also clear that, to determine whether a search is reasonable, a court must balance "the need for the particular search against the invasion of personal rights that the search entails" by considering "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559. In the instant case, Plaintiff has alleged that there was no justification for the search. Defendants had "no reasonable basis to believe that Plaintiff had contraband[,]" and the search was against Montgomery County Department of Correction and Rehabilitation policy—*i.e.*, there was not a general policy that inmates had to be searched before entering the segregation unit. ECF No. 53 ¶ 59. Plaintiff also alleged that Defendant Watkins slammed Plaintiff's head into a shower wall

while Plaintiff was handcuffed, grabbed Plaintiff's genitals through Plaintiff's boxers, and

conducted the search in the shower area instead of in central processing as required by MCCF

policy. *Id.* ¶¶ 54, 59. Defendants do not provide an alternate description of the search nor do they

provide any hypothetical justification for such a search. The Court finds that it is clearly

established that such conduct—*i.e.*, an unjustified, unauthorized, intrusive, and violent strip

search—constitutes an unreasonable search under the Fourth Amendment. *See McCready v.

Richardson*, 738 F.3d 651, 657 (5th Cir. 2013) (finding that it is clearly established that a prison

official must have *a* reasonable justification for strip search a prisoner but holding that, in that

case, defendants had provided some justification and it was not clearly established that

justification was insufficient). Lastly, it is also clearly established that "[a] Court may . . . hold a

public official liable for the acts of her subordinates under § 1983 if the plaintiff demonstrates

supervisory liability, which is based on a supervisor's indifference or tacit authorization of a

subordinate's misconduct." *Pratt-Miller v. Arthur*, 701 F. App'x 191, 193 (4th Cir. 2017).

Finally, the Court must ask "whether a reasonable person in the officer's position would

have known that doing what he did would violate that right[,]" which may necessitate the

resolution of disputed factual issues. *Pritchett*, 973 F.2d at 312. Defendants argue in their Motion

that "Plaintiff has failed to allege that their conduct was anything but objectively reasonable."

ECF No. 55-1 at 35. However, this is untrue, Plaintiff alleges that despite Defendant Malagari,

Green, and Gilliam's knowledge of Defendant Watkins' "history of using unwarranted force on

inmates, they acted with deliberate indifference in failing to investigate allegations against

Defendant Watkins, failing to discipline Defendant Watkins, and in allowing Defendant Watkins

to continue to interact with inmates in an environment where he could continue his abuse with

impunity." ECF No. 53 ¶ 165. Plaintiff further supports this claim with allegations that, despite

repeated requests for MCCF leadership to take action after Defendant Watkins' attack, MCCF did not even begin investigating the incident until June 2018, nine months after the attack had occurred. *Id.* ¶ 84. Additionally, Plaintiff has pleaded that another officer, Lieutenant Wylie, acknowledged MCCF's approach to the investigation was unreasonable: "This PREA case is going to look very bad . . . given the date of the infraction (09/28/17), when Rico first reported the PREA allegation (10/03/2017), and today's date (06/07/2018) that I am starting the investigation. He clearly wrote in several letters . . . to numerous staff that Sgt. Watkins grabbed his genitals!" ECF No. 53 ¶ 83. While the facts are not fully developed and Defendants Malagari, Green, and Gilliam have not yet presented their side of the story, at this stage of the litigation, the Court cannot say that a reasonable person in one of their positions would not have known that what he did was violating Plaintiff's constitutional rights. Thus, the Court declines to dismiss Count XI on qualified immunity grounds at this stage of the litigation, and Defendants' Motion is denied as to that issue.

Because the Court has rejected all of Defendants' arguments against Count XI, Plaintiff's § 1983 claim for supervisory liability against Defendants Malagari, Green, and Gilliam for excessive force and unreasonable search, the Court denies Plaintiff's Motion to Dismiss, or in the Alternative, for Summary Judgment as to Count XI.

### b.    Public Official Immunity

Defendants argue that Defendants Malagari, Gilliam, and Green are entitled to public official immunity with respect to Count X, Plaintiff's negligent retention and supervision claim. The Court disagrees.

"A governmental representative is entitled to public official immunity when: (1) the representative is acting as a public official; (2) the tortious conduct occurred while the

representative was performing discretionary rather than ministerial acts; and (3) the representative acted without malice or gross negligence." *Washington*, 2016 WL 865359, at *8 (citing *Cooper v. Rodriguez*, 118 A.3d 829, 854 (Md. 2015)). "Maryland law is clear that a prison warden is a public official." *Cullen v. Somerset Cty.*, No. CIV.A. WMN-10-055, 2010 WL 2132794, at *8 (D. Md. May 25, 2010). Thus, Defendants Malagari, Gilliam, and Green are public officials. "The term discretion denotes freedom to act according to one's judgment in the absence of a hard and fast rule." *Cooper*, 118 A.3d at 848 (citation omitted). It is undisputed that the conduct in question—including Defendants' supervision of Defendant Watkins, investigation of his conduct, and decision to retain Defendant Watkins—involved Defendants Malagari, Gilliam, and Green's performance of discretionary acts. Nor is it disputed that the culpable conduct occurred while Defendants Malagari, Green, and Gilliam were on the job. Rather, the parties disagree as to whether Defendants acted with gross negligence such that public official immunity does not apply.

Under Maryland law, gross negligence is something more than simple negligence; rather, it is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Cooper*, 118 A.3d at 845–46. "Ordinarily, unless the facts are so clear as to permit a conclusion as a matter of law, it is for the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence." *Washington*, 2016 WL 865359, at *9 (citation omitted).

In the instant case, Plaintiff alleges facts sufficient to constitute gross negligence by Defendants Malagari, Gilliam, and Green. Plaintiff alleges that Defendants Malagari, Green, and Gilliam knew of Defendant Watkins' previous unnecessary use of force against inmates—

including a previous attack on Plaintiff that resulted in Plaintiff requiring medical treatment—and his reputation for using excessive force, but never took any disciplinary action against Defendant Watkins and still retained him despite their knowledge of the risk he posed to inmates. ECF No. 53 ¶¶ 88–90; *see also id.* ¶ 89 ("Plaintiff is aware of other inmates at MCCF who have been assaulted either by Defendant Watkins or other correctional officers while at the facility in all instances known to Plaintiff, no disciplinary action was taken against the correctional officers responsible."). Plaintiff also alleges that Defendants Malagari, Green, and Gilliam failed to begin their investigation of Defendant Watkins' September 2017 attack against Plaintiff—an attack that resulted in Plaintiff requiring treatment in the emergency room, *id.* ¶ 60—for nine months. *Id.* ¶ 83. Moreover, Plaintiff asserts that Defendants Malagari, Green, and Gilliam made no effort to respond to Defendant Watkins' threat to commit more violence against Plaintiff if he filed charges. *Id.* ¶ 75. Drawing all inferences in Plaintiff's favor, Plaintiff has adequately pleaded that Defendant Malagari, Green, and Gilliam disregarded the excessive risk to Plaintiff's, and other inmates', health and safety posed by Defendant Watkins, which constitutes gross negligence. *See Washington*, 2016 WL 865359, at *9 (finding that defendants are not entitled to public official immunity because they acted with gross negligence even though plaintiff did not bring a cause of action for gross negligence); *Cooper*, 118 A.3d at 845–46. Thus, at this stage of the litigation, Defendants Malagari, Green, and Gilliam are not entitled to public official immunity for Count X.

Because the Court has rejected all of Defendants arguments that the Court should dismiss Plaintiff's negligent and retention claim against Defendants Malagari, Gilliam, and Green in Count X, the Court denies Defendants' Motion to Dismiss, or in the Alternative, for Summary

Judgment as it relates to Plaintiff's claims in Count X against Defendants Malagari, Gilliam, and Green.

### vii.  Defendants' Remaining Arguments that the Court Should Dismiss Plaintiff's Claims Against Defendant Montgomery County

Defendants present two categories of arguments against Plaintiff's claims against Montgomery County: (1) Plaintiff's negligent retention and supervision claim against Montgomery County in Count X is barred by governmental immunity, ECF No. 55-1 at 16–18; and (2) Plaintiff fails to state a claim for relief in his *Monell* claims (Counts XII and XIII), *id.* at 35–42. The Court addresses each argument below.

### a.  Governmental Immunity

A local governmental entity is immune from liability for tortious conduct committed while the entity is acting in a governmental capacity, unless its immunity is legislatively waived. *DiPino v. Davis*, 729 A.2d 354, 369–70 (Md. 1999); *Brown v. Bratton*, No. ELH-19-1450, 2020 WL 886142, at *36 (D. Md. Feb. 21, 2020) ("In general, a municipality is immune from common law tort suits when engaged in governmental, as opposed to proprietary, acts."). The employment and supervision of public employees is a governmental function. *See Lanford v. Prince George's Cty.*, 199 F. Supp. 2d 297, 301–02 (D. Md. 2002) ("The employment and supervision of police officers is a governmental function, and not proprietary or corporate."); *Clark v. Prince George's Cty.*, 65 A.3d 785, 791 (Md. Ct. Spec. App. 2013) (holding that "the circuit court correctly ruled that the County could not be sued in its own capacity for common law tort liability, including for the torts of negligent hiring, retention, or entrustment"). Thus, Montgomery County is entitled to governmental immunity. The fact that Defendants Malagari, Green, and Gilliam are not entitled to public official immunity with respect to conduct that constitutes gross negligence does not affect this conclusion. *See Gray-Hopkins v. Prince George's Cty.*, 309 F.3d 224, 234 (4th Cir.

2002) ("The fact that [an individual defendant] is not entitled to public official immunity with respect to intentional torts does not mean that the County is without governmental immunity with respect to such torts."); *DiPino*, 729 A.2d at 370 (holding that, while the officer was not entitled to public official immunity, the municipality was entitled to governmental immunity because the officer was alleged to be performing a governmental function).

Thus, the Court grants Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment as to Plaintiff's negligent supervision and retention claim against Montgomery County in Count X.

### b.     Failure to State a Claim

Defendants argue that Plaintiff has not adequately stated a claim upon which relief can be granted for either of Plaintiff's *Monell* claims: Counts XII and XIII.

Section 1983 permits a plaintiff to bring a claim directly against a municipality if it causes a deprivation of a constitutional right through an official policy or custom. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). However, "a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original). Thus, a local government, such as Montgomery County, "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694. And while *Monell* does not impose heightened pleading requirements above the basic "short and plain statement" requirement of Fed. R. Civ. P. 8(a), *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993), it still requires Plaintiff to adequately plead "the existence of an official policy or custom that is fairly attributable to the municipality and that proximately

caused the deprivation of [his] rights[,]" *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

Plaintiff can show the existence of a policy or custom in four main ways: "(1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'" *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (citing *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)). Plaintiff's Amended Complaint does not reference an express policy, such as a written ordinance or regulation. Nor does it make any reference to a policy established through the decisions of a person with final policymaking authority. Instead, Plaintiff attempts to allege the existence of an official policy or custom by (1) identifying a purported pattern of allowing correctional officers to abuse inmates and apply excessive force without consequence (Count XII), ECF No. 53 ¶ 167; and (2) arguing that Montgomery County failed to train, supervise, or discipline correctional officers to ensure that they properly carried out their duties (Count XIII), *id.* ¶¶ 171–73. The Court address each theory of *Monell* liability below to determine whether Plaintiff has adequately stated a claim upon which relief can be granted.

### 1.    Count XII: Unofficial Policy or Custom

In Count XII, Plaintiff attempts to allege the existence of an unofficial policy or custom by identifying a purported pattern of allowing correctional officers to abuse inmates and apply excessive force without consequence. ECF No. 53 ¶ 167. First, Plaintiff relies on two attacks by the same correctional officer, Defendant Watkins, against the same inmate, himself. *See id.* ¶¶ 88, 92–93. Specifically, Plaintiff alleges that Defendant Watkins attacked him in September

2017, slamming his head against a shower wall while Plaintiff's hands were handcuffed behind

his back, requiring Plaintiff to receive medical care in the emergency room. *Id.* ¶¶ 51, 60.

Defendant Watkins was never disciplined and MCCF failed to even investigate the attack until

nearly nine months later. *Id.* ¶¶ 70, 83, 91–92. Plaintiff also alleges that Defendant Watkins

attacked him in 2012 when "Defendant Watkins threw Plaintiff to the ground, placed a sheet of

plywood on Plaintiff's back, and stomped on it." *Id.* ¶ 88. Again, Plaintiff required medical

treatment but no disciplinary action against Defendant Watkins was taken. *Id.* Second, Plaintiff

relies on his belief that Defendant Watkins has a "lengthy history of using unnecessary force

against inmates[,]" which is supported by Plaintiff's allegation that "another correctional officer

has even complained . . . that the correctional officer does not like to work with Defendant

Watkins because he is abusive to the inmates and asks officers to cover for him." *Id.* ¶ 87.

Plaintiff also pleads that he "is aware of other inmates at MCCF who have been assaulted either

by Defendant Watkins or other correctional officers while at the facility" and in none of these

instances was disciplinary action taken against the correctional officers responsible. *Id.* ¶ 89.

Finally, Plaintiff alleges that the practice of allowing correctional officers to abuse inmates and

apply excessive force without consequence was so widespread and well-settled within MCCF

"that the policy-making officials responsible for corrections either knew about it or should have

known about it" and that if "Montgomery County did not have an unofficial policy, practice, or

custom of allowing correctional officers to abuse inmates without consequences, then Defendant

Watkins would not have assaulted Plaintiff." ECF No. 53 ¶¶ 167–68.

      "Although prevailing on the merits of a *Monell* claim is difficult, simply alleging such a

claim is, by definition, easier. *Owens v. Balt. City State's Att'ys Office*, 767 F.3d 379, 403 (4th

Cir. 2014). While "[i]t is well settled that isolated incidents of unconstitutional conduct by

subordinate employees are not sufficient to establish a custom or practice" at the summary

judgment stage, *Lytle*, 326 F.3d at 473, the Fourth Circuit has clearly stated that "[t]here is no

requirement that [a plaintiff] detail the facts underlying his claims, or that he plead the multiple

incidents of constitutional violations that may be necessary at later stages to establish the

existence of an official policy or custom and causation." *Jordan by Jordan*, 15 F.3d at 339. Thus,

the Court finds Plaintiff has alleged sufficient factual detail to support his *Monell* claim based on

unofficial policy or custom. *See Owens*, 767 F.3d at 403 (finding that the plaintiff's allegations

that the BPD officers withheld exculpatory information "on multiple occasions could establish a

'persistent and widespread' pattern of practice, the hallmark of an impermissible custom.");

*Garcia v. Montgomery Cty., Md.*, JFM-12-3592, 2013 WL 4539394, at *5 (D. Md. Aug. 23,

2013) (finding that plaintiff stated a valid *Monell* claim where he described the incident

involving himself and also alleged "that Montgomery County was aware of unconstitutional

actions by MCPD officers directed towards members of the media but chose to ignore such

behavior."). The Court denies Defendants' Motion to Dismiss, or in the Alternative, for

Summary Judgment as to Count XII.

### 2.    Count XIII: Failure to Train, Supervise, or Discipline

With respect to Montgomery County's purported failure to train, supervise, or discipline

its correctional officers, it is "[o]nly where a failure to train reflects a 'deliberate' or 'conscious'

choice . . . [that] a [county may] be liable . . . ." *City of Canton*, 489 U.S. at 388–89 ("the

inadequacy of police training may serve as the basis for § 1983 liability only where the failure to

train amounts to deliberate indifference to the rights of persons with whom the police come into

contact"). Thus, Plaintiffs' Amended Complaint "should contain facts revealing (1) the nature of

the training, (2) that the training was a 'deliberate or conscious' choice by the municipality, and

(3) that the officer's conduct resulted from said training." *Lewis v. Simms*, No. 11-2172, 2012 WL 254024, at *3 (D. Md. Jan. 26, 2012) (citing *Drewry v. Stevenson*, No. WDQ-09-2340, 2010 WL 93268, at *4 (D. Md. Jan. 6, 2010)). Plaintiff has not even attempted to allege any such facts; instead, he simply states in broad, conclusory terms and in a variety of different ways that Montgomery County failed to train, supervise, and discipline its correctional officers.

Specifically, Plaintiff alleges that Montgomery County "failed to train, supervise, or discipline its correctional officers to ensure that they properly carried out their duties[,]" that "Montgomery County officials were deliberately indifferent to the fact that this failure to train, supervise, or discipline its correctional officers would lead to the use of excessive force against inmates and unreasonable strip searches of inmates[,]" and that "Montgomery County officials knew that prison officials would confront similar or identical situations involving inmates and that correctional officers had a history of applying excessive force to inmates." ECF No. 53 ¶¶ 171–73; *see also id.* ¶ 94 ("Montgomery County also (1) failed to implement an effective training program for correctional officers in order to prevent these abuses; (2) failed to adequately supervise its correctional officers to ensure they were not committing these types of abuses; and (3) failed to discipline its correctional officers when they committed these abuses."). These allegations, however, are nothing more than bare-bones generalizations that a legal element (*i.e.* the policy-or-custom element) is met. Without more, Plaintiff has failed to adequately allege the existence of a policy or custom through Montgomery County's purported failure to train, supervise, or discipline its officers. *See Milligan v. City of Newport News*, 743 F.2d 227, 230 (4th Cir. 1984) (upholding the district court's dismissal of a plaintiff's *Monell* claim where the complaint alleged that "the City was 'grossly negligent' in failing adequately to train its personnel and that this exhibited 'callous disregard' for [the plaintiff]'s constitutional

rights"); *Peters v. City of Mount Rainier*, No. GJH-14-00955, 2014 WL 4855032, at *5 (D. Md. Sept. 29, 2014) (finding that the plaintiff had failed to allege a *Monell* claim against the City where the plaintiff had alleged "that the City maintained an 'official policy' of 'fail[ing] to use due care in the hiring of officers; fail[ing] to properly train and supervise its officers; fail[ing] to implement effective procedures for investigating allegations of police misconduct; fail[ing] to discipline officers who violate the Constitutional rights of private citizens through false arrests, malicious prosecutions, and brutal conduct; and generally fail[ing] to provide safeguards against Constitutional abuses by its overzealous officers.'" (alterations in original)); *Ross v. Prince George's Cty.*, No. 11-1984, 2012 WL 1204087, at *9 (D. Md. Apr. 10, 2012) (dismissing plaintiff's *Monell* claim because the complaint "merely state[d] in conclusory terms that the County failed 'to adequately train and supervise officers in the proper use of force' and that it 'consistently failed' to investigate, discipline, and record acts of excessive force"). Plaintiff has therefore failed to allege a *Monell* claim against Montgomery Count for its purported failure to train, supervise, or discipline its correctional officers. The Court thus grants Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment as it relates to Count XIII.

IV.     **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Bifurcation of Counts XI-XIII and Partial Stay of Discovery is withdrawn, Plaintiff's Motion for Waiver of Notice Requirement Pursuant to the Local Government Tort Claims Act is granted, and Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment is granted, in part, and denied, in part. A separate Order shall issue.

Date: <u>March     30, 2021</u>                   <u>    /s/                          </u>
                                                          GEORGE J. HAZEL
                                                          United States District Judge